**GREENSBORO LUMBER COMPANY, Plaintiff,**

v.

**GEORGIA POWER COMPANY, et al., Defendants.**

**Civ. A. No. C84–2022A.**

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 29, 1986.

Jack H. Watson, Jr., Phillip A. Bradley, Long & Aldridge, Strickland Holloway, Jr., Atlanta, Ga., for plaintiff.

Robert H. Forry, Robert Edwards, Troutman, Sanders, Lockerman & Ashmore, Dorothy Y. Kirkley, Mark L. Gerchick, James A. Orr, Paul, Hastings, Janofsky & Walker, Emmet J. Bondurant, Bondurant, Miller, Hishon & Stephenson, Atlanta, Ga., James C. Brim, Jr., Camilla, Ga., L. Clifford Adams, Heard, Leverett & Adams, Atlanta, Ga., James V. Davis, Landau and Davis, Robert B. Langstaff, Langstaff, Campbell & Plowden, Albany, Ga., Carlton C. McCamy, McCamy, Phillips, Tuggle, Rollins & Fordham, Dalton, Ga., John T. Miller, Jr., Washington, D.C., Richard G. Tisinger, Tisinger, Tisinger, Vance & Greer, Carrollton, Ga., C. Saxby Chambliss, Moore & Chambliss, Moultrie, Ga., for defendants.

Christopher Kerosky, U.S. Dept. of Justice, Washington, D.C., amicus curiae for U.S.

## ORDER OF COURT

MOYE, Chief Judge.

*Background Facts*

This antitrust action is brought by the Greensboro Lumber Company ("Greensboro") against the Georgia Power Company ("Georgia Power"), the Municipal Electric Authority of Georgia ("MEAG"), the participants in MEAG comprised of 46 Georgia municipalities and one county ("Participants"), the Oglethorpe Power Corporation ("Oglethorpe"), the members of Oglethorpe comprised of 39 rural electric membership cooperatives ("EMCs"), and the City of Dalton ("Dalton"). The suit challenges various practices and arrangements among these defendants in the electric service industry in a service area which encompasses most of the State of Georgia. The only areas excluded are relatively small areas served by the Savannah Electric and Power Company (Chatham and Effingham Counties) and certain rural cooperatives in North Georgia (Fannin, Union, and Towns Counties) which purchase their full power requirements from the Tennessee Valley Authority.

The provision of electric service involves several different levels of activity. The supply of electricity to the end-users, agricultural, industrial and residential consumers, is called the "retail distribution" of electricity. Retail electric service in Georgia is supplied by the Savannah Electric & Power Company, the distributors of the Tennessee Valley Authority, Georgia Power, the EMCs, the Participants, two political subdivisions that elected not to join MEAG, and Dalton.

The entities supplying electricity at retail need, in turn, to buy electricity at "wholesale", except to the extent they generate their own power. Electric energy supplied to electric utilities or to public authorities for resale or distribution is referred to as "wholesale electric energy" or "sales for resale."

The generation of electric power in Georgia takes place at a number of central electric generating stations located throughout the state. The output of such stations, together with power supplied from federal hydroelectric facilities provided by the Southeastern Power Administration ("SEPA"), is transmitted over a network of transmission lines and other facilities to "delivery point substations" at which the suppliers of retail electric service receive the power. Such transmission facilities are interconnected through a number of interchange agreements to the transmission systems of utilities outside Georgia, including those in Florida, Alabama, Tennessee, North Carolina and South Carolina. Power sales and purchases made over these transmission interconnections provide additional sources of electric power supply to the wholesale power suppliers in Georgia. As will be discussed later in this opinion, MEAG, Oglethorpe, Georgia Power and Dalton have agreed to operate the transmission lines owned individually by each of them as an "integrated" system.

Electrical power is viewed as having two components, capacity and energy. "Capacity" refers to the capability of a generating unit to produce a specified amount of electrical energy at an instant in time. Capacity is measured in multiples of watts (kilowatts or megawatts) and is analogous to the horsepower of an engine. "Energy" is the electricity actually delivered to customers. It is measured in terms of volume (watts) and time (hours) and is often expressed in kilowatt-hours.

While rate structures may vary, payments for "energy" generally depend upon the amount of electric energy actually taken by the buyer, and are based on the variable costs of generating the energy (fuel and certain operating expenses). When, on the other hand, a buyer pays for "capacity", it makes a payment based on the fixed costs of the capacity committed and not otherwise included as a variable cost (typically including principal and interest payments on debt, certain operation and maintenance expenses and certain other costs). In consideration for this, a specified amount of capacity is reserved for, and dedicated to, the buyer's use. Accordingly,

if capacity is to be paid for, it must be dependable and available for the generation of energy if, as, and when needed by the buyer.

Georgia Power, a subsidiary of the Southern Company, is an investor-owned, vertically-integrated business corporation engaged in the generation, transmission, and retail and wholesale sale of electricity in Georgia. Georgia Power operates on an integrated and pooled basis with other corporate affiliate members of the Southern electric system pursuant to the integration standards of the Public Utility Holding Company Act of 1935, 15 U.S.C. §§ 79k, 79b(a)(29)(A) (1980). Prior to 1976, Georgia Power owned the vast majority of Georgia's electrical bulk power generation and transmission facilities.

In 1971, Georgia Power applied to the Atomic Energy Commission ("AEC"), now the Nuclear Regulatory Commission ("NRC"), for a license to construct the Edwin I. Hatch Nuclear Plant, Unit No. 2 ("Plant Hatch") and the Vogtle Nuclear Plant, Units 1, 2, 3 and 4 ("Plant Vogtle"). Pursuant to Section 105(c) of the Atomic Energy Act, 42 U.S.C. § 2135, the AEC was required to review Georgia Power's license applications to determine whether the issuance of the requested license to Georgia Power "would create or maintain a situation inconsistent with the antitrust laws." This statutory provision also obligates the United States Attorney General to review each license application and to advise the AEC of the need for a hearing to consider potential antitrust objections to the proposed license.

On August 2, 1972, the Antitrust Division of the Department of Justice notified the AEC that the licensing of Plants Hatch and Vogtle raised potential antitrust problems. The Attorney General informed the AEC that the Justice Department's review suggested that Georgia Power had, among other things, exercised its monopoly power to prevent the establishment of alternative bulk power supply systems in Georgia.

As a result of this advice, notice was given to the public and a hearing was scheduled regarding the antitrust implications of Georgia Power's application. The EMCs (through their trade association, the Georgia Electric Membership Corporation), the Participants (through their trade association, the Power Section of the Georgia Municipal Association), and Dalton petitioned to intervene before the AEC in opposition to Georgia Power's application. The AEC set the Hatch application for hearing. At this juncture, a slight digression is appropriate in order to give some background information about these intervenors.

The 39 EMCs are all rural electric membership corporations organized between 1936 and 1945 pursuant to the Georgia Electric Membership Corporation Act, O.C. G.A. §§ 46-3-170 through 46-3-541, and/or its predecessor, the Electric Membership Corporation Act of 1934, O.C.G.A. §§ 46-3-70 through 46-3-97. The EMCs engage exclusively in the retail distribution of electricity to consumers in relatively sparsely-populated rural areas. These consumers automatically become members of the respective corporation. Each customer/"member" of the corporation is entitled to one vote, regardless of the size of its purchase of electricity. Each corporation is governed by a board of directors elected by its members each year at the equivalent of a town meeting. Prior to the creation of Oglethorpe in 1974, the EMCs relied on Georgia Power and, to a limited degree, SEPA for their power and energy.

The Participants consist of 47 Georgia political subdivisions (46 cities and one county, Crisp County). Each Participant engages in the retail distribution of electricity to the consumers living in the area assigned to it by the Georgia Public Service Commission ("PSC"). Prior to the formation of MEAG in 1975, each of the Participants, except Crisp County, was dependent upon Georgia Power and, to a limited degree, SEPA for its wholesale electric requirements. Crisp County owned and continues to own its own generation and transmission facilities.

The City of Dalton engages in the retail distribution of electricity to consumers liv-

ing in Dalton. Dalton declined to join MEAG when MEAG was formed.

Prior to the hearing, Georgia Power, the EMCs, some of the Participants, Dalton, the AEC staff, and the Justice Department negotiated a proposed settlement ("Settlement") in which Georgia Power agreed to sell a portion of certain nuclear-fueled units and of certain coal-fired generation facilities to the EMCs, the Participants, and Dalton. It is worth noting, however, that neither the EMCs nor the Participants have any direct ownership interests in any of these facilities; their interests are held by Oglethorpe and MEAG, respectively. The Settlement also provided that Georgia Power would provide transmission services with respect to the "project power" generated at the jointly owned facilities and would file a "partial requirements tariff" in order to make "supplemental power" available to the other parties at a set rate.[1] In 1975, this tariff was filed with, and approved by, the Federal Power Commission, now known as the Federal Energy Regulatory Commission ("FERC"). Additionally, Oglethorpe, MEAG, and Dalton appointed Georgia Power as their agent with sole authority for, among other things, the planning, licensing, design, construction, operation, maintenance and disposal of the generation facilities. These parties also require Georgia Power to comply with prudent utility practices while pursuing these activities on their behalf.[2] Specifically, the Settlement stated that Georgia Power's license application would be subject to conditions ("License Conditions") providing, among other things, for:

(1) purchase by the EMCs and the municipalities of partial ownership interests in Georgia Power's nuclear plants then under construction or planned for the future;

(2) coordination and sharing of reserves by the parties;

(3) provision of transmission services over facilities owned by Georgia Power; and,

(4) sales of partial requirements at voltages appropriate for the load to be served.

These License Conditions require Georgia Power to provide these bulk power supply services to all utilities offering retail distribution of electricity to the public operating within Georgia Power's service area and to public bodies and cooperatives such as MEAG and Oglethorpe. To effectuate the Settlement, the EMCs, the intervening Participants, and Dalton released any antitrust claims they might have had against Georgia Power.

On August 8, 1974, in order to carry out the terms of the Settlement, to create economies of scale through integrated and unitary operations, and to enhance their own ability to viably compete with Georgia Power, the EMCs formed Oglethorpe.[3] Oglethorpe is a not-for-profit electric generation and transmission cooperative ("G & T") which was organized to supply the electric power needs of its 39 members through the generation, wholesale sale, wholesale purchase, and transmission of electricity. Oglethorpe is wholly-owned and run by its member-owners, which dictate its policies and activities, including the rates which the EMCs will be required to pay for wholesale

---

1. *See*, P. 1377, *infra*.

2. In addition to these Ownership Agreements, Oglethorpe and MEAG have parallel agreements granting Georgia Power the authority to manage, maintain, operate and control the jointly-owned generating facilities. These agreements also provide for the use of power and energy from each plant and the sharing of the costs in accordance with the parties' respective ownership interests. Each is entitled to a percentage of the net power and energy output of each plant equal to its respective percentage ownership interest in such plant.

3. Participation by electric membership corporations with investor-owned utilities in joint generation and transmission projects is not a new concept. For example, in the early 1960's, 30 Ohio corporations formed a generation and transmission cooperative in order to finance their share of a plant constructed and owned by the investor-owned Ohio Power Company. *See REA Financing: Hearing Before the Subcomm. on Conservation and Credit, House Comm. on Agriculture*, 88 Cong., 2d Sess. 8, 11 (1964) (Statement of Harry G. Guthmann).

power, the forecasting and projection of need for future power supplies, and all other major activities of Oglethorpe.

The EMCs are obliged to supply the aggregate requirements of their retail consumers through bulk purchases of power and energy and to maintain a distribution system to deliver power and energy primarily to their rural consumers. In order to meet these obligations, the EMCs entered into a series of "wholesale power sales contracts" under which the EMCs purchase most of their energy needs from Oglethorpe. However, Oglethorpe, through its member-controlled board, sets its rates so that the revenue it receives from the EMCs, with any revenues received from other sources, is only sufficient to pay Oglethorpe's expenses, including costs and interests on all outstanding debts, and to provide for reasonable reserves. Any retained excess revenue is assigned to each EMC as "patronage capital," on the basis of each EMC's purchases.

Similarly, to help effectuate the terms of the Settlement and to create economies of scale, Crisp County and all of the intervening municipalities except for Dalton, which chose to participate in the ownership arrangements on an individual basis, joined MEAG. MEAG was created by the Georgia General Assembly in 1975. O.C.G.A. §§ 46–3–110 *et seq.* It was formed to develop and provide, on a nonprofit basis, electric power in "bulk" to meet the needs of certain municipal and other governmental entities in Georgia (the Participants) that provide electric service at retail to ultimate consumers.[4] To this end, MEAG also entered into a series of "wholesale power sales contracts" with the Participants. O.C.G.A. § 46–3–112 provides that MEAG "shall be a public corporation of the State of Georgia and shall have a perpetual existence. This authority, however, shall not be a state institution nor a department or agency of the state but shall be an instrumentality of the state...." MEAG is governed by nine members, serving three year terms, elected by the Municipal Electric Authority of Georgia Membership Election Committee, which is composed of representatives from each participating political subdivision. O.C.G.A. §§ 46–3–113 through 46–3–116.

The Settlement itself was reviewed by the Department of Justice which opined that partial ownership of the Hatch and Vogtle Plants by MEAG, Oglethorpe and Dalton would not create or maintain a situation inconsistent with the antitrust laws. Moreover, the Justice Department concluded that the partial ownership arrangement as well as the purchase and ownership by Oglethorpe, MEAG and Dalton of portions of the high voltage transmission grid previously owned by Georgia Power would have a pro-competitive effect in the electrical services market because they would provide actual and potential competitors of Georgia Power with viable alternative power supply sources which would, consequently, enable them to compete effectively with Georgia Power.

The acquisition by MEAG, Oglethorpe, and Dalton of ownership in generation facilities created a new need for long-term transmission arrangements. Accordingly, in compliance with the License Conditions, Georgia Power filed, at the same time that it filed its proposed partial requirements tariff, a proposed transmission service tariff with the Federal Power Commission, the predecessor to the FERC. The transmission tariff, which was also approved, provided for the creation of an Integrated Transmission System ("ITS"). The ITS re-

---

4. O.C.G.A. § 46–3–110 Declaration of necessity
 Whereas certain political subdivisions of this state now own and operate electric distribution systems to serve their citizens, inhabitants, and customers by providing them electricity for all purposes; and whereas, if such political subdivisions are to furnish, and if the members of the public in the areas they serve are to receive, adequate service, such political subdivisions must have adequate, dependable, and economical sources and supplies of bulk electric power; it is declared that there exists in this state a need for an authority to function without profit in developing and promoting for the public good in this state adequate, dependable, and economical sources and supplies of bulk electric power and energy for the purposes expressed in this Code section.

sulted from a series of three separate, but substantially identical, ITS agreements entered into by MEAG, Oglethorpe, and Dalton with Georgia Power, which, unlike other Georgia utilities, elected to participate in the ITS.[5] The Participants and the EMCs are not direct parties to the ITS agreements. However, because of agreements between Oglethorpe and the EMCs and between MEAG and the Participants, both the EMCs and the Participants indirectly receive the benefits of the ITS.

Essentially, Georgia Power, Oglethorpe, MEAG, and Dalton agreed to operate as an "integrated" system the transmission lines owned individually by each of them. The agreements provide that each participant in the ITS may use all of the transmission system facilities included in the system in order to meet its transmission needs without charge, regardless of ownership, in serving its own customers. The agreements further provide that each party may, at its own discretion, use the transmission facilities for transactions with small power producers and cogenerators.[6] Participation in the ITS makes it possible to transmit power from central electric generating stations and interconnection points to the retail distribution level. It is through use of the ITS, for instance, that MEAG is able to provide power to the Participants and Oglethorpe is able to provide power to the EMCs. Absent these agreements, the only way each entity would be able to obtain access to electricity generated at a point beyond its own transmission system would

be to obtain the consent of, and pay for the transmission or "wheeling" services of, the owner of the connecting system. Participation in the ITS enables the parties to coordinate the development of their transmission facilities, makes unnecessary the construction of duplicate facilities, and, in general, provides an opportunity for achieving economies of scale.

The ITS is constructed and operated to serve the load of the public utilities operating in Georgia on an integrated basis. The ITS occupies public rights of way which have been acquired in part through powers of eminent domain and is dedicated to public utility service. The partial requirements tariff and the transmission service tariff were approved in 1977 as reasonable by the FERC; they were incorporated into the proposed Settlement.

The Justice Department approved the Settlement, and the antitrust proceeding against Georgia Power was subsequently dismissed. Although the NRC never expressly approved the License Conditions, Dalton, MEAG, and Oglethorpe, nonetheless, entered the bulk power supply field by acquiring interconnected transmission lines and undivided interests in plants Hatch and Vogtle as well as two other coal-fired power generating plants, the Scherer Plant and the Wansley Plant.[7]

Currently, Oglethorpe, MEAG, and Dalton each purchase electric energy and capacity from Georgia Power at the rate established by the partial requirements tariff. The partial requirements tariff is amended

5. In addition, the ITS is connected by means of high-voltage transmission lines to each of the other operating affiliates (Gulf Power Company, Mississippi Power Company and Alabama Power Company) of Georgia Power's parent, the Southern Company, and to other electric utilities. Oglethorpe also has interconnection and interchange agreements with Alabama Electric Cooperative, Inc. and South Mississippi Electric Power Association.

6. *See*, n. 36, *infra*.

7. Two-party ownership agreements relating to Plants Hatch and Wansley were executed between Oglethorpe and Georgia Power and MEAG and Georgia Power. The ownership

agreements relating to Plants Vogtle and Scherer are four-party agreements among Oglethorpe, Georgia Power, MEAG and Dalton. These agreements all appoint Georgia Power as agent with sole authority for, among other things, the planning, licensing, design, construction, operation, maintenance and disposal of the generation facilities, and require Georgia Power to comply with prudent utility practices.

Oglethorpe and MEAG also have parallel agreements providing Georgia Power authority to manage, maintain, operate and control the operation of the jointly-owned generating facilities. These operating agreements also provide for the use of power and energy from each plant and the sharing of costs in accordance with the parties' respective ownership interests.

from time to time subject to the approval of the FERC. Oglethorpe, MEAG, and Dalton also each sell some electric energy and capacity back to Georgia Power pursuant to the joint ownership agreements which exist between and among these parties.

In distributing their retail electricity, Georgia Power, Dalton, the EMCs, and the Participants are all "electric suppliers" as this term is used in the Georgia Territorial Electric Service Act, O.C.G.A. §§ 46–3–1 *et seq*, which was enacted in 1973. As such, they are all governed by the Act. The purpose of this Act is

> (1) to assure the most efficient, economical, and orderly rendering of retail electric service within the state, (2) to inhibit duplication of the lines of electric suppliers, (3) to foster the extension and location of electric supplier lines in the manner most compatible with the preservation and enhancement of the state's physical environment, and (4) to protect and conserve lines lawfully constructed by electric suppliers ...

O.C.G.A. § 46–3–2.

The Georgia Territorial Electric Service Act empowers the Georgia Public Service Commission to assign to individual retail electric power suppliers exclusive geographic territories within Georgia, subject to certain narrow exceptions which are not relevant to this case, for the distribution for retail electricity. The PSC also has the authority to declare a geographic area unassigned if it so chooses. O.C.G.A. §§ 46–3–2 through 46–3–9. The Georgia Territorial Electric Service Act also empowers the PSC to enforce its exclusive territorial assignments:

> At any time, upon its own or the complaint of any other electric supplier or any other interested party, the commission shall have the authority and jurisdiction, after notice to all affected electric suppliers and other interested parties, and after a hearing, to enforce the provisions of this part by appropriate orders.

O.C.G.A. § 46–3–13. This statute was held to be constitutional by the Georgia Supreme Court in *City of Calhoun v. North Georgia Electric Membership Corp.*, 233 Ga. 759, 213 S.E.2d 596 (1975).

Pursuant to this law, Georgia Power, the EMCs, the Participants, and Dalton are authorized to serve exclusively at retail a geographic area designated by the PSC. Neither Oglethorpe nor MEAG has a certified territory in which to serve, and neither serves any electrical load at the retail distribution level. The PSC assigned Rayle EMC the area encompassing the plaintiff's facility in Greensboro, Georgia.

The plaintiff in this action is in the business of producing lumber and lumber by-products for commercial uses. Greensboro has lumber production facilities in Greensboro and Carlton, Georgia. Prior to 1979, the plaintiff purchased all the electric energy it needed to operate its facility in Greensboro, Georgia from Rayle EMC at retail. Greensboro has used and continues to use electric energy purchased from Georgia Power to provide the energy necessary to operate its facility in Carlton, Georgia.

In early 1978, the plaintiff decided to buy and construct a steam-turbine driven generator system to generate electricity at its Greensboro facility. The plaintiff intended to use the waste and some by-products from its lumber production as fuel in order to operate the boiler and the generator system. Greensboro claims that, prior to purchasing or constructing the generator system, it tried to negotiate an arrangement with Rayle EMC whereby Greensboro would simultaneously sell electric energy and capacity to Rayle EMC and buy back-up energy from Rayle EMC; but that Rayle EMC refused. Greensboro also claims that it asked Rayle EMC whether it would consider buying just the excess electric energy and capacity which Greensboro would generate. Greensboro states that Rayle EMC expressed some interest in this proposal but informed Greensboro that all of its purchases would have to be made through Oglethorpe, pursuant to the wholesale power sales contract it had with Oglethorpe.

In the summer of 1978, Greensboro purchased a generator system with a rated capacity of 7500 kilowatts. At its peak, Greensboro uses approximately 2200 kilowatts to operate its facility at Greensboro, Georgia. Because it could not secure a satisfactory price elsewhere, Greensboro constructed its own distribution system. All of this was completed by March 1979, at which time Greensboro disconnected from Rayle EMC and began generating its own electric energy. Greensboro became energy self-sufficient at that plant with no interconnection with any outside source of electric energy and capacity. During the interim, the Federal Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 824a–3, ("PURPA"), which shall be discussed later in this opinion, was enacted by Congress.

Several months after it began generating electricity, Greensboro actively began to seek purchasers for its excess electric energy and capacity. The plaintiff conducted negotiations with MEAG; however, Greensboro alleges that MEAG offered a price for Greensboro's electric energy which was less than half of what it cost Greensboro to generate it, was far below MEAG's avoided energy cost, allegedly in violation of PURPA, and included no payment for capacity.

Greensboro received a similar response from Georgia Power, which offered to pay Greensboro a "split-the-savings" energy cost rate for its output.[8] Additionally, Greensboro claims that Georgia Power offered to sell back-up energy at retail to Greensboro on the condition that Rayle EMC consent; but that, Rayle EMC refused. As well, the plaintiff alleges that Georgia Power refused to go along with Greensboro's alternative suggestion that, rather than having Greensboro sell its electric energy and capacity to Georgia Power,

Georgia Power transmit Greensboro's excess electric energy on the ITS to Greensboro's facility in Carlton. Georgia Power claims, however, that it is physically impossible, from an engineering perspective, to direct energy generated at the plaintiff's Greensboro premises across the ITS for delivery to the plaintiff's Carlton Plant.

Greensboro asserts that, having no other buyer available, it entered into a five-year contract on August 3, 1981, with Oglethorpe for the sale of its electric energy and capacity. However, the plaintiff alleges that Oglethorpe pays significantly less under this contract than Oglethorpe's avoided energy and capacity costs and less than Oglethorpe pays Georgia Power under the partial requirements tariff for its energy and capacity. Additionally, Greensboro asserts that since the consummation of the contract with Oglethorpe, Oglethorpe has made numerous unilateral changes in the terms of the contract, including changes in certain rates and the method by which capacity payments are calculated.

Among the terms of this contract was a requirement that Greensboro be allowed to interconnect with the ITS. This was done in September, 1981; however, Greensboro claims that it was overcharged for the construction of the interconnection facility. Although it is a generator and wholesale seller of electricity, Greensboro does not own any electric lines, other than those which connect its plant to the statewide transmission grid. The plaintiff is not engaged in the transmission business.

Regarding sales of retail power to Greensboro, Greensboro entered into a contract with Rayle EMC for the purchase of this service. Greensboro asserts, however, that, during the period from March 1979 through the end of 1983, with the exception

---

**8.** This rate is set at a level somewhere between the incremental cost of the seller and that of the buyer, at a price lower than the cost the buyer would incur were the buyer to produce the electric energy itself but at a price which still provides a profit to the seller. Significantly, however, at this time the PSC had not yet issued a directive implementing PURPA which would have required Georgia Power to offer to pay its full avoided energy costs to Greensboro. The Georgia Public Service Commission did not issue a directive to this effect until April 5, 1983. That directive did not provide for any payment for avoided capacity costs; the PSC saved addressing this issue for an unspecified, future time.

of a limited period of time, it was unable to obtain back-up, maintenance or interruptible power from either Oglethorpe or Rayle EMC. While conceding that Rayle EMC has offered to sell some back-up energy to it, the plaintiff claims that these offers were at a price which was not just and reasonable. The plaintiff does admit that Rayle EMC began to provide it with scheduled maintenance power in 1984; however, Greensboro states that it was told that it could not receive scheduled maintenance power during the period from June 1 through September 30. Greensboro alleges that on September 10, 1984, it was forced to shut down its generating facility because of an emergency equipment failure. Greensboro claims to have asked both Oglethorpe and Rayle EMC to provide it with emergency interruptible back-up power; but that, they refused. As a result, the plaintiff states that it was forced to shut down its generation and its lumber production facilities.

On July 13, 1984, in what the plaintiff characterizes as a desperate, good faith effort to sell its electric energy and capacity at fair prices, Greensboro mailed a letter to Georgia Power, each of the EMCs, Dalton, MEAG, and each Participant soliciting from each an offer to purchase its electric energy and capacity. The letter also requested each utility to provide the plaintiff with data pertaining to its system costs. Greensboro claims that (1) Georgia Power indicated a willingness to negotiate a contract which would pay Greensboro the amount of Georgia Power's avoided costs for energy but no amount for capacity; (2) four of the EMCs did not respond at all; (3) the remaining EMCs responded by refusing to purchase Greensboro's energy and capacity; (4) MEAG indicated a willingness to negotiate a contract which would pay Greensboro the amount of MEAG's avoided costs for energy but no amount for capacity; (5) each Participant, except Crisp County and Albany responded to Greensboro through MEAG and declined to contract directly with Greensboro; (6) Albany responded by referring Greensboro to MEAG; (7) Crisp County provided the information requested but, while it did not make any offers to purchase, it specifically informed Greensboro that no payment would be made for its capacity; and (8) Dalton did not respond. Not having received any answers to its liking, Greensboro filed this lawsuit.

*The Complaint*

Count I of the amended complaint challenges the following conduct as violative of § 1 of the Sherman Act: (1) the wholesale power sales contracts between Oglethorpe and the EMCs; (2) the wholesale power sales contracts between MEAG and the Participants; and (3) the joint operation and ownership agreements between and among Oglethorpe, Georgia Power, MEAG and Dalton. Greensboro claims that these actions eliminate competition and reduce trade in the electric energy and capacity transmission, wholesale sale, and wholesale purchase markets. This, in turn, has the effect of precluding persons such as Greensboro from competing with Georgia Power, Oglethorpe, MEAG, and Dalton in these markets. Specifically, Greensboro alleges that it was injured because it could not transmit its electric energy and capacity to potential customers within and outside Georgia and it could not sell its electric energy and capacity to the EMCs and to the Participants.

Count II of the amended complaint alleges that the defendants monopolized or attempted to monopolize the transmission, wholesale purchase and wholesale sale of electricity in the State of Georgia in violation of § 2 of the Sherman Act. Greensboro alleges that the defendants have monopolized, or attempted to monopolize, the transmission of electric energy and capacity through their joint ownership and operation of the ITS. Greensboro claims that through this monopoly power and through the wholesale purchase and sale agreements which exist between and among the parties, the defendants have monopolized, or attempted to monopolize, the wholesale purchase and sale markets. The plaintiff maintains that, as a result of these actions, it has been prevented from transmitting its

electric energy and capacity to potential customers within and outside of Georgia and has been prevented from selling electric energy and capacity to the EMCs and to the Participants.

Count III of the amended complaint alleges that the power supply contracts of Oglethorpe, the EMCs, MEAG, and the Participants violate § 3 of the Clayton Act. These exclusive dealing agreements tend to create a monopoly in the wholesale sale, and a monopoly in the wholesale purchase, of electric energy and capacity in the State of Georgia. Greensboro claims that it has suffered harm because it has been prevented from selling electric energy and capacity to the EMCs and to the Participants.

Count IV of the amended complaint alleges violations of PURPA by Oglethorpe, the EMCs, MEAG, and all of the Participants with the exception of the City of Albany. Under PURPA, these defendants were required to submit to the FERC their plan for implementation of each of their obligations under PURPA. (These implementation plans are hereinafter referred to as "Interconnection Policies"). The Interconnection Policy of Oglethorpe and the EMCs provide that only Oglethorpe will purchase energy and capacity from qualifying cogeneration facilities and qualifying small power production facilities ("qualifying facilities") and that only the EMCs will sell supplemental, interruptible, back-up and maintenance power to qualifying facilities. The Interconnection Policy of MEAG and the Participants (except Albany) provides that, with respect to qualifying facilities with design capacity greater than 100 kW, such as Greensboro, only MEAG will purchase energy and capacity. Furthermore, only the Participants, with the exception of the City of Albany, will provide retail service to a qualifying facility. Greensboro contends that these Interconnection Policies violate PURPA on their faces and as applied to Greensboro.

Count V of the amended complaint alleges violations of PURPA by Oglethorpe and Rayle EMC. Greensboro alleges that from August 1981 until February 1984, with the exception of a limited period of time, Greensboro was unable to obtain back-up or maintenance power at a nondiscriminatory, just and reasonable rate from either Oglethorpe or Rayle EMC. Greensboro claims that Rayle EMC and Oglethorpe refused to sell it schedule maintenance power from June 1 through September 30 of each year. Furthermore, according to Greensboro, both Rayle EMC and Oglethorpe still refuse to make interruptible power available to Greensboro. These actions, Greensboro contends, violate PURPA.

Count VI of the amended complaint is a state breach of contract claim against Oglethorpe based on alleged violations of the energy and capacity contract which exists between Greensboro and Oglethorpe.

*Oglethorpe and the EMCs*

Oglethorpe and the EMCs (hereinafter "the Oglethorpe Group") characterize the case at bar rather poetically as "a case crafted of whole cloth—spun out of misapplied antitrust theory, grandiose rhetoric, and counsel-generated controversy." The Oglethorpe Group expresses the view that Greensboro, a for-profit co-generator of electricity, is complaining about the joint ownership of Georgia Power's generation and transmission facilities by the defendants, private municipal and rural cooperative utilities, because it does not desire to become, and accept the responsibilities and restrictions of being, a public utility. The Oglethorpe Group has filed a motion for summary judgment on all counts.

Oglethorpe owes its existence to the Rural Electrification Administration ("REA") in that it is principally financed by loans and loan guarantees of the United States, acting through the REA. The REA was established in 1935 by Executive Order to "initiate, formulate, administer and supervise a program of approved projects with respect to the generation, transmission and distribution of electric energy in rural areas." Executive Order No. 7037 (May 11, 1935). The REA became a permanent agency of the federal government pursuant to the Rural Electrification Act of 1936 ("REA Act"), 49 Stat. 1363, 7 U.S.C. §§ 901

through 916. The objectives of the REA Act were to extend the benefits of economical central station service [9] to the numerous farms in sparsely-settled areas in which investor-owned utilities had not found it profitable to provide service. *See* 80 Cong.Rec. 2752 (daily ed. Feb. 25, 1936); *Salt River Project Agricultural Improvement and Power District v. Federal Power Commission*, 391 F.2d 470, 473 (D.C. Cir.), *cert. denied*, 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126 (1968).

Although a few electric corporations predated the REA, in 1936, fewer than 10% of the nation's farms had central station electric service.[10] Rural electric corporations, the principal and preferred recipients of REA loans, have since become important suppliers of energy to rural America. In Georgia, for example, the EMCs cumulatively serve about one-quarter of the state's total population, almost entirely in Georgia's most sparsely-populated rural areas.

While Oglethorpe was not formed until 1974, similar federated G & Ts began to form across the country soon after the passage of the REA Act nearly fifty years ago. These cooperatives were formed to meet the perceived need for greater efficiency in rural electric service through large-scale power generation and distribution. In essence, G & Ts were a direct response to

a vital fact of the electric industry, known to Congress when the Rural Electrification Act was passed in 1936, and which has grown in importance with technological developments—*viz.*, that the cost of power from a generating plant constructed by a typically small REA-financed rural electric distribution system would, in general, be prohibitively high.[11]

Under the plan of the REA Act, the REA is to lend money to federated cooperatives for the construction of a single generating plant and transmission line so that these federated cooperatives may, in turn, supply their member distribution systems with wholesale power which they, in turn, distribute to their member consumers at retail.[12] This plan has, by and large, worked

---

**9.** The term "central station service" is used in the REA Act, *see e.g.,* 7 U.S.C. § 902, to describe electric service from a central generation facility that serves numerous consumers. This is distinguished from, for example, electricity available only from small-scale, single-farm generators.

**10.** *Rural Electrification: Hearing on S.3483 Before the House Committee on Interstate and Foreign Commerce,* 74th Cong.2d Sess. 8, 39 (1936) (statement of Morris L. Cooke, REA Administrator) (hereinafter cited as "*1936 Hearings*"). By 1923, thirty-one rural electrical cooperatives had been incorporated in nine states. Ellis, C., *A Giant Step,* 33 (1966).

**11.** Response of Appellees Rural Electrification Administration, Norman M. Clapp, United States Department of Agriculture, and Orville L. Freeman, to petition for Rehearing and Petition for rehearing en banc, filed May 24, 1968, pp. 5–6, *Alabama Power Co. v. Alabama Electric Cooperative, Inc.,* No. 23,016 (5th Cir.) ("REA Reply Brief"). *See also* 80 Cong. Rec. 2756 (daily ed. Feb. 25, 1936), in which Senator Norris, a drafter of the REA Act, said during a Senate debate: "It would not be good business to build a generating system for a single farmer's organization. The expense in such a case would be too high, so that it would not be a self-liquidating proposition. But one generating system may supply half a dozen or a dozen farm organizations...."

**12.** Former REA Administrator Claude Wickard testified before a Senate subcommittee on the shift within the agency toward federated cooperatives and away from individual utilities. *See* Hearings before the Senate Subcommittee of the Committee on Agricultural Appropriations for 1951, 81st Cong., 2d Sess., p. 1341. Federated cooperatives have been of great benefit to the movement for rural electrification. The Fifth Circuit in *Alabama Power Co. v. Alabama Electric Cooperative, Inc.,* 394 F.2d 672, 677 (5th Cir.), *cert. denied,* 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968) (quoting *Federal Power Commission v. Dairyland Power Cooperative,* 37 F.P.C. 12, 35 L.W. 2385) described federated cooperative as "something more than public utilities; they are instrumentalities of the United States. They were chosen by Congress for the purpose of bringing abundant, low cost electric energy to rural America.'"

While the REA loans are made to the federated cooperatives, the individual distribution systems are the member-owners and exercise complete control over the management of the federated cooperatives. Hence, the REA loans are, in fact, made for the benefit of each of the member distribution systems and their consumers.

quite well. As Senator McGovern stated during the 1971 oversight hearings:

> The G. & T. cooperatives have provided a yardstick of wholesale power cost and service for the entire program and for the country. All consumers of electric power, regardless of the utility providing the service, will be injured if the G. & T. cooperatives' ability to serve rural America is diminished.[13]

Continued federal support for G & Ts has been recognized as essential to permit small rural distribution systems and small municipal systems to be able to bargain effectively with investor-owned utilities for wholesale power supplies:

> Without the leverage of alternative power supply sources, a rural electric distribution cooperative (and, in the same way, a small municipal electric system) is at a real disadvantage in bargaining for wholesale power supply with a large investor-owned system. The lack of available G. & T. funds ... has effectively taken away the strongest bargaining tool of the small distribution utilities.

> In summary, an adequate supply of reasonably priced electric power for rural America depends in great measure on enough money in REA's electric loan program for generation and transmission loans to give small systems a chance to strike the best deal for reasonably priced, adequate electric power supply, and ... protect them from complete dependence on the large companies with whom they frequently must compete for retail loads.[14]

In the 1971 Senate Hearings, Senator McGovern specifically referred to the desirability of the G. & T. alternative in Georgia as a means of alleviating dependence upon large investor-owned utilities for supplies of wholesale power:

> [a] rural electric cooperative manager from Georgia wrote to me—'if adequate low-cost capital is not made available soon for generation and transmission cooperatives, it is just a matter of time before the power companies will absorb distribution cooperatives through their wholesale power contracts.'[15]

REA Administrator Norman Clapp voiced similar sentiments when he stated that,

> Participation of the small systems in the benefits of coordination and a continuous search for means of broadening this participation are fundamental if these systems are to continue to provide low cost power to their consumers and make the most efficient use of our fuel and capital resources.... Very few individual cooperative and municipal systems are able independently to realize the economies of scale associated with large generating units.... Their individual system demands are insufficient to warrant their sole ownership of such units. To some extent and in some places, the cooperatives have overcome this handicap by federating in power supply systems.

*Participation by Small Electrical Utilities in Nuclear Power: Hearings before the Joint Comm. on Atomic Energy,* 90th Cong., 2d Sess. 111–112 (1968) (Statement of Norman M. Clapp, REA Administrator).

The REA's longstanding policy has been to make G & T loans when borrowers are unable to purchase an adequate and dependable supply of power, or when net wholesale costs would be reduced, but not to finance duplicative or unnecessary facilities.[16] To further this goal, the REA has

---

REA Reply Brief, *supra* at 6.

**13.** *Financial Needs of Rural Electric Cooperatives: Hearing Before the Subcomm. on Agricultural Credit and Rural Electrification, Senate Comm. on Agriculture and Forestry,* 92nd Cong., 1st Sess. 2 (1971) (opening remarks of Chairman McGovern) (hereinafter cited as *"1971 Senate Hearings"*).

**14.** *1971 Senate Hearings,* at 97 (Statement of Alex Radin, General Manager, American Public Power Association).

**15.** *1971 Senate Hearings,* at 3.

**16.** *See 1971 Senate Hearings,* at 201 (Statement of David Hamill, REA Administrator); Chase, "Why Power Cooperatives?" *Rural Electrification,* August 1950, at 52. The G & T loan program began to flourish as early as 1961 after

urged participation by federated coopera-
tives in agreements involving the joint own-
ership and operation of large-scale genera-
tion facilities:

> These considerations point up the urgent
> necessity for providing at this time as-
> surance of participation by all electric
> utilities in a given region, including the
> electric cooperatives, in nuclear power
> plants planned for construction.

> The smaller systems cannot survive if
> their only stance is that of 'trickle down'
> beneficiaries, barred from direct partic-
> ipation in the economies associated with
> large-scale nuclear generation and EHV
> delivery of low-cost federally produced
> power.

> They cannot survive if they are restrict-
> ed to generating their own power in
> small, obsolescing conventional plants or
> to purchasing power on the basis of over-
> all system costs of their supplier, and are
> not admitted to the more sophisticated
> arrangements which have been devel-
> oped reflecting the economies of the new
> large-scale technologies.[17]

Although the REA makes long-term
loans to finance the construction and opera-
tion of generating plants, electric trans-
mission and distribution systems, 7 U.S.C.
§§ 901, 904, with an express preference for
loans to public entities and federated coop-
eratives, the REA Act authorizes the REA
Administrator to make loans only to those
organizations which will furnish electric en-
ergy to "persons in rural areas who are not
receiving central station service.... Such
loans shall be on such terms and conditions
... as the Administrator shall deter-
mine...." 7 U.S.C. § 904. The REA Act
further requires that such loans "be self-
liquidating within a period of not to exceed
thirty-five years," id., and prohibits the
Administrator from making any loans un-
less he "finds and certifies that in his judg-
ment the security therefor is reasonably
adequate and such loan will be repaid with-
in the time agreed." Id. The Administra-
tor is required to report annually to Con-
gress on REA's loan activities. 7 U.S.C.
§ 910.

Between 1975 and 1984, the REA entered
into a number of loan agreements pursuant
to Title 3 of the REA Act, 7 U.S.C. § 931,
with Oglethorpe for the benefit of the
EMCs and their consumers. As of March
12, 1985, the REA had made or approved
loan guarantees to Oglethorpe in the
amount of $3,765,763,278.00 and had ap-
proved insured loans to Oglethorpe in the
amount of $26,530,000.00. Insured loans
are made principally for distribution facili-
ties, while loan guarantees are made pri-
marily to finance generation and trans-
mission facilities. Full repayment of all
the loans currently guaranteed or insured

---

Norman Clapp became REA Administrator and
REA recognized the need for G & T loans to
ensure the "security and effectiveness" of the
REA-financed systems:

> It was a clear signal that REA was leaving
> behind its ambiguous and timid policies on G
> & T loans, giving the go-ahead for the co-ops
> to get on with their business of meeting their
> growing wholesale power and utility responsi-
> bilities. Hefty budgets for G & T loans, with
> approving nods from the Kennedy and John-
> son White Houses, accelerated the program.

*The Next Greatest Thing*, p. 185 (R. Spence, ed.
1984). *See also Supplemental Financing of REA
Programs: Hearings on S.3337, S.3720, Before
Subcomm. on Agricultural Credit and Rural
Electrification, Senate Comm. on Agriculture
and Forestry*, 89th Cong., 2d Sess. 191–92 (1966)
(Statement of Norman M. Clapp).

**17.** *Participation by Small Electrical Utilities in
Nuclear Power: Hearings Before the Joint
Comm. on Atomic Energy*, 90th Cong., 2d Sess.
114 (1968) (Statement of Norman M. Clapp,
REA Administrator). The REA's support of
joint projects is not limited to joint ownership
of nuclear plants; REA's endorsement of joint
projects extends to "access to large-scale genera-
tion and transmission of whatever character of
fuel involved". *Id.* at 117. Continued encour-
agement by REA for joint and coordinated par-
ticipation of G & T cooperatives is manifested
by the fact that, although the first REA loan for
a joint project was not made until 1968, by 1977,
75% of all REA loan guarantee authority was
devoted to financing participation of coopera-
tives with investor-owned utilities in coal-fired
and nuclear-powered generating facilities. *Agri-
culture, Rural Development and Related Agen-
cies for Fiscal Year 1979, Part I—Justifications:
Hearings Before Subcomm. of the Senate Comm.
on Approp.*, 95th Cong. 2d Sess. 886 (1978).

by the REA is not scheduled to occur until the year 2021.

In order to pay off its indebtedness, Oglethorpe receives revenue from the EMCs for their purchases from Oglethorpe under the wholesale power sales contracts. These contracts, which extend through the year 2022, obligate each EMC to buy all of its power and energy requirements from Oglethorpe, with the exception of a small amount of power purchased from SEPA pursuant to pre-existing arrangements. The wholesale power sales contracts provide that if an EMC purchases electric energy and capacity from any other source, Oglethorpe will charge that EMC for any revenues lost by Oglethorpe as a result of the purchase. Oglethorpe, in turn, purchases power and energy from Georgia Power under the partial requirements tariff and from qualifying facilities as necessary to supplement the output of its own power generation resources. In 1983, Oglethorpe purchased approximately 43% of the total energy it sold to the EMCs from Georgia Power and about 1% from qualifying facilities.

Oglethorpe argues that, as a condition of, and security for, its loans and loan guarantees to it, the REA required Oglethorpe to enter into the wholesale power sales contracts with the EMCs. This contention is supported by the United States acting on behalf of the REA, which has filed various *amicus curiae* papers before this Court in this case. Both the Oglethorpe Group and *amicus curiae* United States argue that the REA Act authorizes the REA Administrator to determine "adequate security" and the "terms and conditions relating to the (loans) and the security" for the REA loans to Oglethorpe. 7 U.S.C. § 904. Accordingly, they maintain that the "all-requirements" contracts between Oglethorpe and the EMCS, which are challenged by Greensboro in Counts I, II, and III, were executed pursuant to, and at the directive of, the REA.

*Amicus curiae* United States argues that the REA has a long-standing policy of requiring wholesale power sales contracts, virtually identical to the one executed between Oglethorpe and the EMCs, as the principal means of securing its loans. The all-requirements provisions of the wholesale power sales contracts ensure that Oglethorpe will have a steady and predictable market for its energy product; this, in turn, produces the revenue stream which secures repayment of the multi-billion dollar loans guaranteed by the REA. The Oglethorpe Group directs this Court's attention to the fact that similar considerations led the Supreme Court implicitly to recognize the necessity of long-term all-requirements contracts in the electric utility industry. In rejecting an antitrust challenge to a utility's 20-year all-requirements contracts, the Court in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 334, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), reasoned as follows:

> [A]t least in the case of public utilities the assurance of a steady and ample supply of fuel is necessary in the public interest. Otherwise consumers are left unprotected against service failures owing to shut downs; and increasingly unjustified costs might result in more burdensome rate structures eventually to be reflected in the consumer's bill.

The Court found such "considerations" to have "compelling validity" in the utility field. *Id.*

Additionally, the Oglethorpe Group and the United States argue that long-term all-requirements wholesale power sales contracts, virtually identical to those questioned by plaintiffs in this case, were expressly held valid and immune from antitrust scrutiny in *Alabama Power Co. v. Alabama Electric Cooperative, Inc.*, 394 F.2d 672 (5th Cir.), *cert. denied*, 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968).[18]

---

18. Quoting from an affidavit by the REA Administrator, the Fifth Circuit stated in *Alabama Power Company v. Alabama Electric Cooperative, Inc.*, 394 F.2d 672, 676 (5th Cir.1968):

> [The cooperative] is owned and controlled by its members and is merely the means by which they generate and transmit electric power for themselves rather than purchasing

The complaint in *Alabama Power* sought antitrust damages and an injunction voiding 35–year all-requirements electric power sales contracts between an Alabama electric generation and transmission cooperative and its 14 electric distribution cooperative members. The Fifth Circuit affirmed dismissal of the antitrust claims, specifically holding that the all-requirements contracts "were the result of valid governmental action and, hence, not violative of the antitrust laws." 394 F.2d at 673.

Greensboro advances several arguments to support its position that the Oglethorpe Group is not immune from antitrust liability. First, Greensboro argues that the REA Act, REA Bulletins, and the loan agreements themselves do not mandate the challenged all-requirements contracts. Second, Greensboro argues that *Alabama Power* is factually distinguishable from the instant case. Third, in the alternative, Greensboro argues that *Alabama Power* is no longer good law. This Court rejects each of Greensboro's contentions.

■ As to Greensboro's first contention, while it may be true that the loan agree-

ments do not specifically mention "all-requirements" contracts, they do contain pertinent and applicable provisions which obligate Oglethorpe to enter into wholesale power contracts with each of the EMCs "in form and substance satisfactory to the Administrator." [19] As attested to by Harold V. Hunter, the REA Administrator, since its first loan to Oglethorpe in 1975, the REA has found such contracts "satisfactory" only if they contain provisions binding the EMCs to purchase all of their power needs from Oglethorpe for the life of the loan. The United States notes additionally that this practice is well-established; it seems that every REA Administrator since 1950, prior to approving any loans, has only been "satisfied" when wholesale power sales contracts exist which contain all-requirements provisions.[20]

■ Greensboro also implies that if the Administrator does require all-requirements contracts, his actions would be in excess of his authority under the REA Act and, thus, ultra vires. This Court believes

---

power and transmission service from another source. Instead of having one organization performing the generating, transmitting and distributing function, [the cooperative] engages in the first two operations on behalf of its members and the latter perform the distributing operation. Because of this separation of the operations required to serve consumers [,] the 35–year, all requirements contracts between [the cooperative] and the Members were necessary to meet the requirements of the [Rural Electrification] Act.

This decision constitutes binding precedent in the Eleventh Circuit pursuant to *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

19. The Consolidated Loan Agreement between the REA and Oglethorpe, dated June 1, 1984, restricts the release of loan funds for the purchase of Plants Hatch and Wansley upon evidence that:

The borrower has duly authorized, executed and delivered, in form and substance satisfactory to the Administrator, the following:
(i) wholesale power contracts between the Borrower and each of its thirty-nine member distribution cooperatives,

Article II, Section 9(A)(1)(c). This agreement also states that all funds for the purchase of Plant Scherer are conditioned upon evidence that:

The borrower has submitted an executed agreement, satisfactory to the Administrator, with each of its member distribution cooperatives, extending the term of the present wholesale power agreement through calendar year 2022.

Article II, Section 9(B)(9).

20. Furthermore, Greensboro's allegation that none of the REA Bulletins, which set forth the agency's lending policies, include reference to the all-requirements contracts as necessary security for REA loans, is not entirely accurate. REA Bulletin 111–1, dated April 24, 1969, on the subject of "Wholesale Power Contracts for the Purchase and Sale of Electric Energy", states that wholesale power sales contracts between federated cooperatives and their distribution members should "provide for the security requirements of REA loans." Additionally, a Memorandum to the Bulletin, dated March 18, 1970, states unequivocally that all wholesale power sales contracts entered into by the borrower are subject to the approval of the REA. In light of the long-standing practice by the REA of requiring federated cooperatives to enter into all-requirements contracts with their members, the plaintiff's allegation is dubious.

that this implied argument has been laid to rest by the court in *Alabama Power.* Furthermore, the legislative history of the REA Act lends support to the view that Congress meant to bestow broad discretion upon the Administrator in order to carry out the purposes of the REA Act.[21]

Almost from the inception of the loan program, REA administrators have required that the contracts between the borrowing federated cooperatives and the individual distribution systems contain all-requirements provisions covering at least the period of the loan. The all-requirements provisions of the wholesale power sales contracts not only ensure that the cooperatives will have an adequate market for their power among their local utility members during the period of the loan but also assure the REA that the utilities making up the federated cooperative seriously desire the loan to be made and intend to use its share of the power capacity which the loan would create. This customary and long-established practice of the REA has been made known to, and acquiesced in, by Congress. During the 1951 hearings before a Senate Subcommittee of the Committee on Appropriations, the all-requirements agreements were characterized by the REA Administrator as the principal security for REA loans. The complete text of a typical all-requirements contract was also placed into the record of those hearings. *See* Hearings before the Senate Subcommittee of the Committee on Appropriations on Agricultural Appropriations for 1951, 81st

Cong., 2d Sess., pp. 1342 *et seq.* Moreover, Congress has annually received reports of the agency's activities and has approved continued funding for the same.[22] Although it is a hazardous venture to draw any conclusions from congressional inertia, this Court feels that, if anything, Congress' inaction in the face of long-standing REA practices indicates an endorsement of these practices. *See Salt River Project Agricultural Improvement and Power District v. Federal Power Commission,* 391 F.2d 470, 477 (D.C.Cir.) *cert. denied,* 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126 (1968).

As to Greensboro's second contention, this Court believes that the *Alabama Power* case disposes of the issue of the legality of the all-requirements wholesale power contracts. In *Alabama Power,* a public utility filed a complaint seeking antitrust damages and an injunction restraining the REA from lending $20,350,000.00 to an electric cooperative and avoiding 35–year all-requirements electric power contracts between the borrowing federated cooperative and its fourteen electric distribution corporation members. Despite a strong dissent by Judge Godbold, the Fifth Circuit affirmed the lower court's dismissal of the antitrust claims, holding specifically that the all-requirements contracts "were the result of valid governmental action and, hence, not violative of the antitrust laws." 394 F.2d at 673. The court's decision was based on a determination that, by requiring

---

**21.** For example, Rep. Rayburn, sponsor of the House bill, referred to the "great power that was given to the Administrator." 80 Cong.Rec. 5281 (April 9, 1936). Sen. Norris, sponsor of the Senate bill, also stated that, "in this proposed legislation we are giving, and we necessarily must give, if we are going to make a success of the measure, in my opinion, almost unlimited discretion, something that under ordinary circumstances I do not like to do. But if the Administrator, whoever he may be, carrying out this proposed law is not at heart converted to the idea embodied in it, namely, to extend the blessings of electricity to the farmers of America, he could easily wreck this whole program and still be technically in the right." 80 Cong. Rec. 3308 (March 5, 1936). As well, the United States Court of Appeals for the D.C. Circuit, in *Salt River Project Agricultural Improvement and*

*Power District v. Federal Power Commission,* 391 F.2d 470, 476 (D.C.Cir.), *cert. denied* 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126 (1968), noted that, "[i]f anything the emphasis in Congress was on the Administrator's need for 'almost unlimited discretion' and 'extraordinary power' if he were to oversee effectively the rural electrification program."

**22.** See also *Salt River Project v. F.P.C.,* 391 F.2d 470, 476, n. 15 (D.C.Cir.1968), in which the court observed that, "[t]he repeated administrative practice of the Rural Electrification Administration ... has never been criticized by the successive Congresses to which it is by statute directed to report annually of its progress and activities."

the federated cooperative to obtain 35–year all-requirement contracts with its electric distribution corporations, the REA Administrator "was doing nothing unusual, but was simply following customary and long-established REA practice, clearly not beyond the 'outer perimeter' of his statutory authority to determine the security for the loan. Anything less might well mean the acceptance of inadequate security." 394 F.2d at 676 (footnote omitted). Since the REA Administrator was immune from antitrust suit under *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), for government actions within the scope of his duties as delineated in § 4 of the REA Act, the court held that the federated cooperative, wholly-owned by its member distribution corporations, must also be implicitly exempt from liability under the antitrust laws. Even though the court "fully appreciate[d] that immunity from the antitrust laws is not to be lightly implied," 394 F.2d at 677 n. 9, the court explained that antitrust liability could not be imposed on the REA borrower for complying with valid government requirements:

> The making of loans by the Administrator necessarily includes the existence and ability of borrowers to whom such loans can be made. If the security which the Administrator requires can be undercut and the borrower mulcted in treble damages for complying with the condition imposed by the Administrator for making the loan, then the functioning of the Act will be crippled, if not defeated. To avoid frustrating the intent of Congress, it must follow that in cases where the Administrator is immune from suit under the antitrust laws, the borrower is likewise immune.

394 F.2d at 677 (footnote omitted). *See also Medical Association of the State of Alabama v. Schweiker*, 554 F.Supp. 955, 966 (M.D.Ala.1983) *aff'd. per curiam sub. nom Medical Association v. Heckler*, 714 F.2d 107 (11th Cir.1983). ("The Sherman Antitrust Act's prohibitions on the making of agreements in restraint of trade is not applicable to the federal government and its officials acting in their official capacity.... Similarly, private parties to the extent they are acting at the direction or with the consent of federal agencies also fall outside the pale of the act's prohibition.").

■ Greensboro argues that there are significant factual differences between the case at bar and *Alabama Power* which render the latter inappropriate to any determination of the former. Greensboro maintains that *Alabama Power* merely held that a government borrower is immune from antitrust liability to the extent that the government's security interest is the subject matter of the antitrust action. Greensboro asserts that the government only has a security interest in Oglethorpe's REA-financed bulk power generating facilities, not in the purchase of bulk power by Oglethorpe from Georgia Power for resale to the EMCs.[23] Greensboro argues that this position is supported by the fact that the all-requirements contracts obligate the EMCs "to purchase all of their electric requirements to the extent the borrowers shall have power and energy available." Greensboro interprets the term "available" to mean only that power which Oglethorpe generated itself from its REA-financed facilities, rather than from Oglethorpe's purchases from other sources. In other words, Greensboro argues that the challenged wholesale power sales contracts are not really all-requirements contracts.

This Court, however, feels that this is too stringent an interpretation of the term. The wholesale power sales contracts expressly recognize that Oglethorpe "may purchase or otherwise obtain electric power and energy for the purpose" of supplying the EMCs. The all-requirements contracts

---

**23.** For purposes of any determination in the present case, this distinction, if in fact one exists, may be irrelevant. For the reasons set out in the FERC order, discussed later in the text of this opinion, this Court rejects the plaintiff's argument that it has suffered any economic injury cognizable under the antitrust laws because Oglethorpe is the sole purchasing agent for the EMCs.

in the present case, like those in *Alabama Power,* clearly contemplate that the federated cooperative will generate, purchase, or otherwise obtain electric power and energy for its member corporations. Hence, it is more logical to interpret the term "available" to mean power available through generation and purchase rather than through generation alone. A careful reading of Judge Godbold's dissent makes clear that this is how the *Alabama Power* court interpreted the term "available." While it is true that the majority, quoting from the REA Administrator's affidavit, stated that, "[u]nder their contracts, with [the federated cooperative], the Members will be free to purchase from plaintiff and others their electric requirements in excess of the power and energy available from [the federated cooperative]," 394 F.2d at 676, it is also clear that the contracts provided that, upon the request of the federated cooperative with the approval of the REA, the members were to terminate all existing contracts with sources other than the cooperative. Additionally, the contracts provided that if, upon request, the member failed to terminate any contract with any power supplier other than the cooperative, either the cooperative or the REA could sue the member for specific performance. 394 F.2d at 678.[24] *See also United States v. Coosa Valley Electric Cooperative, Inc.,* Case # 85–C–0515–5 (N.D.Ala. February 5, 1986) [Available on WESTLAW, DCTU database] (court finds "immaterial" the fact that

some of the power provided in fulfillment of the challenged all-requirements contract was purchased, rather than produced, by the wholesale supplier). Furthermore, it is clear from the record before this Court that the REA, Oglethorpe, and the EMCs never interpreted the wholesale power sales contracts to be anything less than true all-requirements contracts.

As to Greensboro's third contention, this Court is of the opinion that *Alabama Power* remains in full force and effect in this Circuit. Although a foreign circuit opinion, *Hecht v. Pro-Football, Inc.,* 444 F.2d 931, 934 n. 6 (D.C.Cir.1971), has questioned the current validity of the majority opinion in *Alabama Power,* no court has overturned, reversed, or even narrowed the *Alabama Power* decision.[25] At least one court has explicitly affirmed the continuing validity of *Alabama Power. United States v. Coosa Valley Electric Cooperative, Inc.,* Case # 85–C–0515–5 (N.D.Ala. February 5, 1985) (40–year all-requirements power supply contracts between wholesale power cooperatives and their members are valid, enforceable, and immune from antitrust scrutiny in light of *Alabama Power* ). Furthermore, it appears that *Alabama Power* has continuing validity in the Eleventh Circuit. *See Medical Association,* 714 F.2d 107. *See also Saenz v. University Interscholastic League,* 487 F.2d 1026, 1028 (5th Cir. 1973); *Vest v. Waring,* 565 F.Supp. 674,

**24.** In fact, within two years after the *Alabama Power* decision, the Alabama Electric Cooperative entered into contracts for the purchase of power with the Alabama Power Company in order to meet its members' demands that exceeded Alabama Electric Corporative's generating capacity. At that time, members were precluded from buying power from other sources without the consent of the Alabama Electric Cooperative.

**25.** The plaintiff's reliance on *Otter Tail Power Company v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), where the Supreme Court rejected claims of antitrust immunity, is misplaced. In *Otter Tail,* the Supreme Court held that an electric utility company could not claim immunity merely because it was subject to federal regulation. In this case, unlike *Otter Tail,* the claim of immunity is based on the fact

that the challenged conduct was actually compelled by the REA. In fact, the *Otter Tail* court went out of its way to make clear that the Federal Power Commission had not compelled the private party to act and to stress the difference between "business judgment" which is subject to regulation and "regulatory coercion" when analyzing questions of antitrust immunity. 410 U.S. at 373–374, 93 S.Ct. at 1027–28. *Woods Exploration & Producing Co. v. Aluminum Company of America,* 438 F.2d 1286 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) is similarly inapposite: "[W]hile we cannot hold that actions taken pursuant to Commission regulations violate the antitrust laws, we can hold that actions taken to subvert the Commission scheme for anticompetitive purposes are subject to antitrust strictures." 438 F.2d at 1303.

686 (N.D.Ga.1983), both of which cite *Alabama Power* with approval.

This Court is not unsympathetic to the plaintiff's position. The majority's opinion was not only criticized by Judge Godbold in dissent but has also been severely criticized in some well-considered scholarly commentary. *Alabama Power Co. v. Alabama Electric Cooperative:* Rural Electrification and the Antitrust-Irresistible Force Meets Immovable Object, 55 Va.L.Rev. 325 (1969). The Court, however, is not considering this issue as a matter of first impression. *Alabama Power* is dispositive of the issue at hand. *Alabama Power* remains in full force and binding effect in this circuit unless and until it is overruled by the Eleventh Circuit Court of Appeals sitting *en banc*.

■ Regardless, to the extent that Greensboro alleges that Oglethorpe has conspired with the EMCs, through the use of the power sales contracts, in violation of § 1 of the Sherman Act, this Court holds that Oglethorpe and the EMCs constitute a single entity and, hence, are incapable of conspiring under § 1.[26] *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The *Copperweld* court cited *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products, Co.*, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962) as providing "strong support" for the "principle that substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1." *Copperweld*, 467 U.S. at 773, n. 21, 104 S.Ct. at 2743, n. 21.

In general, a business entity "should be free to structure itself in ways that serve efficiency of control, economy of operations, and other factors dictated by business judgment without increasing its exposure to antitrust liability." *Copperweld*, 467 U.S. at 773, 104 S.Ct. at 2743. As

discussed earlier in this opinion, this Court considers Oglethorpe and the EMCs to be, in economic substance, an integrated unitary business enterprise.[27] Oglethorpe is, in essence, a wholly-owned subsidiary of its collective members which was created for the purpose of providing them with their power supply needs. As such, Oglethorpe and its members are legally incapable of concerted action in violation of the antitrust laws. *See City of Fulton, Missouri v. Associated Electric Cooperative*, Case # N83-1C (E.D.Mo. March 8, 1985) [Available on WESTLAW, DCTU database] (defendants, a "super" generation and transmission cooperative which acts as bargaining and purchasing agent for the benefit of its owners, six generation and transmission cooperatives, which, in turn, are owned by 43 distribution cooperatives which primarily serve as retailers to their owners, their consumer-members, constitute a single entity legally incapable of conspiring). *See also Century Oil Tool, Inc. v. Production Specialities, Inc.*, 737 F.2d 1316 (5th Cir. 1984) (two corporations which were wholly owned by three persons who together managed all affairs of the two corporations were a single entity for purpose of suit asserting a violation of the Sherman Antitrust Act); *Lake Communications, Inc. v. ICC Corporation*, 738 F.2d 1473 (9th Cir. 1984) (two wholly-owned subsidiaries of common parent incapable of conspiring).

■ The Oglethorpe Group further maintains that it is entitled to summary judgment on Counts I, II, and III because the plaintiff has suffered no injury from any alleged antitrust violations and, therefore lacks standing to sue under the Clayton Act, 15 U.S.C. § 15. This Court agrees. Greensboro has not demonstrated "with a fair degree of certainty" in its complaint or in any subsequent papers that it has suffered any injury in fact, much less any injury compensable under the antitrust

---

**26.** Greensboro attempts characterize Oglethorpe as a joint venture. This Court believes that this is a mischaracterization. Oglethorpe is not a joint venture among competitors for a single or limited purpose or transaction. Oglethorpe is a permanent ongoing organizational structure created and controlled by its members to serve

as a conduit in order to generate electricity for their own resale needs. Oglethorpe is integral to the EMCs' overall operations as the supplier and transmitter of their "product."

**27.** See notes 12 and 18, *supra*.

laws. *Davis v. Northside Realty Associates, Inc.*, 95 F.R.D. 39, 45 (N.D.Ga.1982).

■ With regard to the alleged "prevention of sales" to the EMCs, on the record before this Court it is undisputed that in 1981 Oglethorpe offered Greensboro a one-year contract under which Oglethorpe would purchase Greensboro's excess energy and capacity for the same amount that Oglethorpe would be paying Georgia Power in 1982 pursuant to the partial requirements tariff, $5.10 per month per kilowatt-hour of effective capacity and an initial energy payment of 21.58 mills per kilowatt.[28] It is similarly undisputed that Greensboro declined this offer preferring the security of a five-year contract which paid Greensboro the above-stated rates for 1981 and 1982 with modest energy rate increases of 6% annually and capacity rate increases of 2% annually commencing on and after January 1, 1983.[29] Additionally, nowhere does Greensboro explain how it could have obtained any higher price from the EMCs in the absence of the challenged wholesale power sales contracts. Moreover, it is highly unlikely that Greensboro would be able to do so since it is clear that, if the EMCs were not required to purchase all of their power from Oglethorpe, they would be free to purchase power from Georgia Power at the price specified by the partial requirements tariff. It flies in the face of reason to think that either Oglethorpe or the EMCs would be willing to pay Greensboro more for its energy and capacity than it could pay to Georgia Power for equivalent power. Nothing in the antitrust

---

**28.** Greensboro's only reference to this issue is contained in the affidavit of its president, Thomas Guthrie, who states that he does not recall being offered a one-year contract pursuant to which Oglethorpe would purchase Greensboro's excess energy and capacity for the same amount Oglethorpe would be paying Georgia Power in 1982 for equivalent purchases under the partial requirements tariff. However, such an equivocal response is insufficient to create a genuine issue of material fact. *See, e.g., Carter v. Newsday, Inc.*, 528 F.Supp. 1187, 1191 (E.D.N.Y.1981) ("The nonmovant may generate uncertainty as to the true state of any material fact by coming forth with affidavits or other discovery materials, but may not rely 'upon the mere allegations or denials of his pleading.' Rule 56(e), F.R. Civ.P. Nor may the nonmovant rely upon deposition statements to the effect that the deponent 'does not remember' a particular fact, as a means of putting that fact in issue."); *Erickson v. Said*, 42 F.R.D. 170, 172 (S.D.N.Y.1967) (opposing party "did not recall" whether or not a material fact was as stated by moving party); *See generally*, 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* 56. 15[3] at 56–484 n. 39 (2d ed. 1985) (party opposing summary judgment may not simply plead ignorance in lieu of controverting affidavits of movant).

Additionally, it is worth noting that, in all probability, under "pure" market conditions Greensboro would have had to negotiate a price somewhat below the price Oglethorpe was paying Georgia Power. As the D.C. Circuit noted in *American Electric Power Service Corp. v. Federal Energy Regulatory Commission*, 675 F.2d 1226, 1235 n. 37 (D.C.Cir.1982), *rev'd sub nom. American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 722 (1983) (reversing D.C. Circuit's holding that the FERC's avoided costs and interconnect rules were arbitrary and capricious, but not disagreeing with the D.C. Circuit's economic analysis), unregulated, competitive sales of power in the electric utility industry are usually made on a "split-the-savings" basis which would benefit both parties to the transaction. Thus, for example, Utility A, with available electricity that cost $5 per kilowatt to generate, will sell to Utility B, whose costs are $7 per kilowatt, for a price somewhere between $5 and $7 per kilowatt. By contrast, as a result of FERC regulations, Greensboro obtained an offer equal to the price Oglethorpe was paying Georgia Power, a price above that which would have been offered under pure market conditions in the absence of FERC regulations, even though this price would prevent Oglethorpe from realizing any benefit from the transaction. In essence, FERC has prescribed an above-market rate in order to encourage the development of qualifying facilities. This price was, by definition, the highest price attainable by Greensboro within the confines of a competitive market as constrained by the FERC regulations.

**29.** PURPA does not preclude qualifying facilities and electric utilities from negotiating a contract which sets a price that is lower than a full-avoided cost rate. Indeed, as the Supreme Court noted in *American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 416, 103 S.Ct. 1921, 1929–30, 76 L.Ed.2d 722 (1983): "Because the full-avoided-cost rule is subject to revision by the Commission as it obtains experience with the effects of the rule, it may often be in the interest of a qualifying facility to negotiate a long-term contract at a lower rate. The Commission's rule simply establishes the rate that applies in the absence of a waiver or a specific contractual agreement."

laws requires the Oglethorpe Group to pay Greensboro more for its power when the same power may be purchased from Georgia Power or others for less. As the Supreme Court stated in *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 279, 88 S.Ct. 1575, 1587–88, 20 L.Ed.2d 569 (1968) (affirming a summary judgment for the defendant while rejecting an oil dealer's boycott claim based on the oil company's refusal to purchase plaintiff's oil at a specified price), "[o]bviously it would not have been evidence of conspiracy if [defendant] refused to deal with [plaintiff] because the price at which he proposed to sell oil was in excess of that which oil could be obtained from others." *See also American Telephone and Telegraph Co. v. Delta Communications Corp.*, 408 F.Supp. 1075 (S.D.Miss.1976), *aff'd per curiam*, 579 F.2d 972 (5th Cir.1978), *aff'd on rehearing*, 590 F.2d 100 (5th Cir.1979) (where an alleged anticompetitive conspiracy "is predicated on a failure to buy a service worth money for a moneys worth price, the plaintiff has the burden of demonstrating that his product has some value above the price paid or offered." 408 F.Supp. at 1101. The court further refused to recognize any "inference of conspiracy or anticompetitive activity" arising out of "a refusal to buy a product or service for more than it is worth." 408 F.Supp. at 1090 n. 29. Any additional payment "would have been a gift," and the "Sherman Act does not command gratuitous compensation." 408 F.Supp. at 1092).[30] Having been offered a price which is above

the market rate as a result of FERC's regulations,[31] Greensboro is in no position to demand a still higher price under any antitrust theory.

In Counts I–III, Greensboro also challenges the joint ownership and operation agreements which exist among the defendants. Greensboro alleges that it has suffered because it was prevented from using the defendants' jointly owned generation and transmission facilities. This Court feels that any such injury is, at best, wholly speculative. With respect to the joint ownership of generation facilities, the Court finds that there is no allegation or evidence that connects this activity to any anticompetitive harm supposedly suffered by the plaintiff. With respect to the joint operation of the transmission system facilities, this Court finds significant the fact that Greensboro does not allege anywhere, nor does it otherwise show, that, prior to the filing of this suit, it ever requested Oglethorpe to transmit Greensboro's energy over the ITS, much less that it ever sought to sell energy to any non-defendant "potential customer," either within or outside of Georgia, or that any such "potential customer" offered it a price higher than that which Oglethorpe pays to Greensboro. Before one can complain of being prevented from using something, one must have sought permission to use it and been refused. *See Cleary v. National Distillers and Chemical Corp.*, 505 F.2d 695, 697 (9th Cir.1974) ("A demand and refusal is a prerequisite to a claim of concerted refusal

---

30. Indeed, if Oglethorpe were to so subsidize Greensboro, this would directly contravene clearly-articulated congressional policy underlying PURPA. Congress expressly provided in PURPA that utilities should not pay qualifying facilities such as Greensboro a price in excess of the utility's "incremental cost ... of alternative electric energy." 16 U.S.C. § 824a–3(b). This provision was enacted because PURPA was "not intended to require the ratepayers of a utility to subsidize cogenerators or small power producers." H.R.Rep. No. 1750, 95th Cong., 2d Sess. at 98, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 7832. The congressional purpose in limiting the price to qualifying facilities was to ensure that PURPA did not become a utility-funded welfare program for qualifying facilities, since

such "funding" would essentially come from the pockets of electric consumers. The "full avoided cost" (the term used in FERC's rules) or "incremental cost" (the term used in PURPA) ceiling ensures that payments to qualifying facilities will not increase a utility's overall costs. In fact, the rates charged to consumers will remain the same "for, by hypothesis, the utilities would have incurred the same costs had they generated the energy themselves or purchased it from other sources instead of purchasing from a qualifying facility." *American Paper Institute*, 461 U.S. at 415 n. 9, 103 S.Ct. at 1929 n. 9 (1983).

31. *See* n. 28, *supra*.

to deal.... A plaintiff can have no relief when his failure to obtain a desired product is attributable to his own failure to make a request."); *Nishimura v. Dolan,* 599 F.Supp. 484, 498 (E.D.N.Y.1984); *Cinema-Tex Enterprises, Inc. v. Santikos Theaters, Inc.,* 414 F.Supp. 640, 643 (W.D.Tex. 1975), *aff'd,* 535 F.2d 932 (5th Cir.1976).

In general, the ITS is an integrated transmission system which operates in interstate commerce. The FERC regulates, under the Federal Power Act, 16 U.S.C. § 824, both the sale of energy for resale in interstate commerce and the transmission of energy in interstate commerce. Georgia Power is a public utility within the meaning of the Federal Power Act, and is regulated as such by the FERC, because Georgia Power sells energy at wholesale to, and provides transmission of service for, the members of the ITS. Georgia Power has on file with the FERC a tariff applicable to the transmission service it provides which was approved by the Federal Power Commission, the predecessor to the FERC, as part of the Settlement. This transmission service tariff expressly limits ITS participation to public utilities, as well as public bodies and cooperatives.[32] As established by the transmission service tariff and the Federal Power Act, ownership participation in the ITS is open to any electric company in the service area which elects to become a public utility under the laws of either Georgia or the United States, to provide retail electric service in Georgia,

and to subject itself to PSC regulation. Greensboro is not a public utility and has disclaimed any interest in becoming a public utility or entering the retail distribution business. As such, it is ineligible to become a "member" of the ITS, unless it receives authorization, in the form of a waiver from this requirement, from the FERC. *See* 16 U.S.C. § 824j.

In reality, as noted above, Greensboro has not expressed any interest in becoming a "member" or joint owner of the ITS. Greensboro's only claimed interest in the ITS is to use it on the same terms and conditions as the defendant as a transportation vehicle to sell its excess energy and capacity to the EMCs, the Participants, Dalton, and other potential wholesale purchasers. Greensboro has, in fact, been interconnected with, and, although it must pay an interconnection fee to Oglethorpe, has had access to, the ITS since September 1981. Although the plaintiff has failed to specify what extra burdens it must endure in order to have access to the ITS, it appears to the Court that Greensboro's real complaint is with its inability to sell its power to the aforementioned utilities. The genesis of this complaint lies in the wholesale power sales contracts between Oglethorpe and the EMCs and between MEAG and the Participants and not in the existence or operation of the ITS.

Moreover, if anything, the ITS facilitates, rather than impedes, Greensboro's ability to buy and sell power.[33] While it is

---

**32.** Unless and until the FERC were to adopt and approve rescission or modification of the transmission service tariff, Georgia Power and its customers that are subject to the tariff are legally obligated to comply with it. 16 U.S.C. § 824d; 18 C.F.R. § 35.1(e); *Northwestern Public Service Co. v. Montana-Dakota Utilities Co.,* 181 F.2d 19 (8th Cir.1950), *aff'd* 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951). The regulatory system of filed, approved, and effective tariffs could not work if the parties governed by those tariffs could not obey them without fear of suffering antitrust damages or if regulatory decisions could be side-stepped by Sherman Act actions. *See Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). Any challenge to the transmission

service tariff should be directed to the FERC, the federal regulatory agency with exclusive jurisdiction over the tariff. 16 U.S.C. § 824(b). *See Federal Power Commission v. Florida Power & Light Co.,* 404 U.S. 453, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972). *See also Nantahala Power & Light Co. v. Thornburg,* — U.S. —, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986).

**33.** It is difficult, in fact, to theorize how Greensboro has been harmed by the defendants' joint ownership and operation agreements. One theory, however, is that, absent the formation of Oglethorpe and its participation in generation and transmission, Greensboro would have less competition from suppliers of wholesale power and, therefore, would be able to sell its surplus power at higher prices. It is well-established,

true that Greensboro cannot freely transmit its power, the transmission service tariff and the ITS agreement clearly offer Greensboro a greater opportunity than it would otherwise have to transmit its power to other purchasers. Because it is interconnected with the ITS, Greensboro is able to generate its excess power into the utility control area. As a result, since September, 1981, Greensboro has been able to sell its surplus power to an increased number of potential purchasers, namely those utilities whose transmission lines are not directly connected to Greensboro's generation facilities but whose transmission lines are connected to the integrated system, without having to negotiate any separate transmission or wheeling arrangements and charges. It remains undisputed that, absent integration, no entity could obtain access to electricity generated among its own transmission lines without the consent of, and payment to, intervening owners of transmission facilities. As well, as a result of the ITS agreements, each party to the ITS may use all of the transmission system facilities included in the system, regardless of ownership, to serve its customers. Greensboro has put forth no evidence to support its claim that it has been prevented

from dealing with other potential wholesale purchasers or from transmitting power to its other facility at Carlton by some unreasonable restriction on the use of the ITS.[34]

The Oglethorpe Group maintains that it is entitled to summary judgment on Counts IV and V, Greensboro's PURPA claims. Before getting to the merits of the Oglethorpe Group's position, a brief background discussion of PURPA is in order.

PURPA was enacted on November 9, 1978, as part of the National Energy Act, a comprehensive legislative package designed to deal with the nationwide energy crisis.[35] The legislation was designed "to control consumer costs" and ensure sustained long-term economic growth by shifting the nation's reliance on oil and gas to more abundant domestically produced fuels. *See Federal Energy Regulatory Commission v. Mississippi*, 456 U.S. 742, 745, 102 S.Ct. 2126, 2130, 72 L.Ed.2d 532 (1982).

Section 210 of PURPA specifically seeks to encourage the development of cogeneration and small power production facilities, referred to throughout this opinion as qualifying facilities, such as Greensboro.[36] *See*

---

however, that the antitrust laws were enacted to protect and enhance competition, not competitors. E.g., *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). There is little doubt that the efficiencies gained as a result of the defendants' joint ownership and operation agreements facilitate, rather than hinder, competition in the electric power and supply industry in Georgia. As the REA Administrator testified in 1968 regarding joint participation in large-scale powerplants, "the very existence of these consumer-owned systems assures preservation of the pluralistic character of the industry and lends a competitive force which serves as a bulwark against monolithic monopoly." *Participation by Small Electrical Utilities in Nuclear Power: Hearings Before the Joint Comm. on Atomic Energy*, 90th Cong., 2d Sess. 110 (1968).

**34.** The Oglethorpe Group also maintains that it is entitled to summary judgment on Counts I–III because (1) Greensboro has failed to join the REA and the United States, which Oglethorpe contends are indispensable parties under F.R. Civ.P. 19 and (2) Greensboro's claims are barred by the four-year statute of limitations contained in § 4B of the Clayton Act. Additionally, the

Oglethorpe Group contends that it is entitled to summary judgment on Count II because, as a matter of law, it lacks sufficient market power in any relevant market to permit a finding of monopoly power, or of a dangerous probability of acquiring monopoly power. This Court does not express any opinion as to the merits of these contentions at this time.

**35.** In addition to PURPA, the package included the Energy Tax Act of 1978, Pub.L. No. 95–618, 92 Stat. 3174; the National Energy Conservation Policy Act, Pub.L. No. 95–619, 92 Stat. 3206; the Powerplant and Industrial Fuel Use Act of 1978, Pub.L. No. 95–620, 92 Stat. 3289; and, the Natural Gas Policy Act of 1978, Pub.L. No. 95–621, 92 Stat. 3351.

**36.** A "cogeneration facility" is one that produces both electric energy and steam or some other form of useful thermal energy, such as heat. 16 U.S.C. § 796(18)(A). A "small power production facility" is one that has a production capacity of no more than 80 megawatts and uses primarily biomass, waste, or renewable resources (such as wind, water, or solar energy) to produce electric power. § 796(17)(A). "Quali-

*American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983). Prior to PURPA, Congress felt that two problems impeded the development of nontraditional generating facilities: (1) traditional electricity utilities were reluctant to purchase power from, and to sell power to, the nontraditional facilities, and (2) the regulation of these alternative energy resources by state and federal utility authorities imposed financial burdens upon the nontraditional facilities and thus discouraged their development. 456 U.S. at 750–751, 102 S.Ct. at 2132–33. To overcome these problems, Congress directed the FERC to develop a comprehensive regulatory regime governing purchases and sales between utilities and qualifying facilities. *See* 16 U.S.C. § 824a–3(a)–(c). Congress also provided for enforcement of these obligations pursuant to a set of comprehensive and complicated statutory provisions that substantially limit federal jurisdiction. *See Id.* at § 824a–3(f), (g), and (h).

The FERC issued regulations implementing PURPA on February 19, 1980. 45 Fed. Reg. 12,214. The regulations require electric utilities (a) to sell electric energy and capacity to qualifying facilities upon request[37], (b) to purchase electric energy and capacity from qualifying facilities and (c) to make all necessary interconnections with any qualifying facility in order to accomplish the aforementioned purchases and sales provided that each qualifying facility pay its share of the interconnection costs.[38] These regulations mandate that an electric utility offer a qualifying facility built after the enactment of PURPA a purchase rate equal to, but no more than, the utility's "full avoided costs."[39] *See* 18 C.F.R. § 292.303(a) and (b), and § 292.304(b). However, the regulations also expressly provide that the parties may negotiate to purchase and sell at another lower rate. 18 C.F.R. § 292.301(b)(1). *American Paper Institute*, 461 U.S. at 416, 103 S.Ct. at 1929–30. The FERC regulations thereby provide for a negotiable purchase rate or, at the qualifying facility's option, the electric utility's full avoided costs, the maximum level required by Congress.

fying facilities" are cogeneration and small power production facilities meeting the requirements of 18 C.F.R. §§ 292.201 through 292.207.

**37.** The types of electric services to be provided to the qualifying facility are supplementary power, back-up power, maintenance power, and interruptible power. *See 18 C.F.R. § 292.-305(b).* These are all retail services.

**38.** "Sections 210 and 212 of the Federal Power Act (FPA), 16 U.S.C. §§ 824i and 824k (1976 ed., Supp. V), describe the procedure to be followed by the FERC when an electric utility, federal power marketing agency, cogenerator, or small power producer applies for an order requiring another such facility to make an interconnection.... Section 212 of the FPA, 16 U.S.C. § 824k (1976 ed., Supp. V), provides that an order approving an interconnection under § 210 may be issued only if the Commission determines that the interconnection is not likely to result in a reasonably ascertainable uncompensated loss for any electric utility, cogenerator, or small power producer, impose an undue burden on any such facility, unreasonably impair the reliability of any electric utility, or impair the ability of any electric utility to supply adequate service to its customers." *American Paper Institute*, 461 U.S. at 408–409, 103 S.Ct. at 1925–26.

**39.** A utility's full avoided cost is defined as the electric utility's "incremental cost ... of alternative electric energy." 16 U.S.C. § 824a–3(b). Congress defined this as "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." *Id.* at § 824a–3(d). The terms "full avoided costs," which appears in the FERC's rules, and "the incremental cost of alternative electric energy," which appears in § 210(d) of PURPA, are synonymous. Through this statutory scheme, Congress sought both to provide incentives for the development of qualifying facilities and to ensure that a utility and, ultimately, its consumers would not be forced to subsidize a qualifying facility by paying a qualifying facility more for its energy than the price at which the utility could obtain the same amount of energy on the open market, or could generate the same energy itself. *See* n. 30, *supra.* As the Joint Conference Committee Report explained, "[t]he provisions of this section are not intended to require the rate payers of a utility to subsidize cogenerators or small power producers." H.R.Rep. No. 1750, 95th Cong., 2d Sess. at 98, *reprinted* in 1978 U.S.Code Cong. & Ad.News at 7832. *See also American Paper Institute*, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983).

In establishing PURPA, however, Congress did not intend to place qualifying facilities in competition with public utilities. To the contrary, Congress has sought to encourage the development of qualifying facilities by insulating them from competition. Qualifying facilities are not authorized under PURPA to sell at retail, *see* section 210(a); and, in the wholesale market, PURPA establishes a guaranteed price which is equal to, or greater than, the price that would be received in a competitive market. In addition to providing a guaranteed price to qualifying facilities, PURPA also provides a guaranteed market for the power generated by qualifying facilities by making it a requirement that utilities purchase available energy and capacity from qualifying facilities before buying power from anywhere else; no amount of price cutting or other competition can change this result. In general, qualifying facilities produce a component which is used by public utilities and consume utility service; but, they are not competitors of public utilities.

PURPA also requires all "nonregulated utilities", such as Oglethorpe, the EMCs, MEAG, and the Participants, to submit to the FERC individual Interconnection Policies to assure the FERC that each such utility will implement its obligations under 18 C.F.R. § 300 *et seq.* (except the reporting requirement contained in 18 C.F.R. § 292.302). 16 U.S.C. § 824a–3(f); 18 C.F.R. § 292.401(b).

Following public hearings, the Oglethorpe Group adopted an Interconnection Policy which provided that only Oglethorpe would purchase energy and capacity from qualifying facilities, and only the EMCs would sell energy and capacity to qualifying facilities. In the Report of Implementation, the Oglethorpe Group also specified that Oglethorpe would pay newly-established qualifying facilities a rate for their capacity and energy based on the full amount of payments that Oglethorpe would, as a result of its purchases from qualifying facilities, avoid making to Georgia Power to purchase power under the partial requirements tariff approved by the FERC.

Recognizing a potential inconsistency between its Inter-connection Policy and the FERC rules requiring each utility both to purchase from, and to sell to, qualifying facilities, the Oglethorpe Group, on January 22, 1981, filed a request for waiver of FERC's regulations to the extent that they require the EMCs to purchase energy and capacity from, and Oglethorpe to sell at retail to, qualifying facilities. After nearly a three-year delay, Greensboro intervened in the waiver proceeding. On July 23, 1985, the FERC issued its decision granting in part and denying in part the Oglethorpe Group's waiver petition. On April 21, 1986, on petitions for rehearing, the FERC reconsidered its July 23rd Order in part and granted a portion of Oglethorpe's waiver petition which it had previously denied.

On July 23, 1986, the FERC waived the EMC's purchase obligations. The Commission concluded that requiring the EMCs to purchase energy and capacity from qualifying facilities was not necessary to encourage qualifying facilities, the aim of PURPA. The Commission concluded that Oglethorpe's rates, based on its full avoided cost, were in compliance with FERC's regulations and, thus, sufficient to encourage qualified facilities. The FERC noted that, in passing PURPA, it was Congress's intent to ensure that qualifying facilities have a market for their power under reasonable terms; furthermore, Congress vested the FERC with broad power to construct a regulatory framework to achieve that end. The Commission determined that allowing Oglethorpe to act on behalf of the EMCs would not frustrate Congress's intent since no qualifying facility would be deprived of a market for its power and each would receive a rate established as sufficient to encourage qualifying facilities.

The FERC concluded that Greensboro's argument that the EMCs might calculate avoided costs a different way than Oglethorpe such that the EMCs might provide a higher rate to qualifying facilities was entitled to little weight. The FERC reasoned,

quite correctly, that it would be utterly illogical to suppose that an EMC would voluntarily opt to pay Greensboro more for its power than it has to pay.

On April 21, 1986, the FERC ruled that Oglethorpe was not required to make sales of back-up and maintenance power to qualifying facilities on an interruptible basis so long as the EMCs offer to make such sales, upon request, at cost-justified rates. The FERC determined that requiring Oglethorpe to provide duplicative retail services was "unnecessary for the encouragement of qualifying facilities." The order stated that so long as the EMCs offer retail services to qualifying facilities at cost-justified rates, the Oglethorpe Group's Interconnection Policy, which expressly restricts each EMC's service area to that assigned to them by the PSC under the Georgia Territorial Act, was otherwise "consistent with the Commission's regulations."

▮▮ Greensboro challenges the Oglethorpe Group's Interconnection Policy as applied. Specifically, the plaintiff claims, with respect to sales, that Oglethorpe and Rayle EMC have failed to provide Greensboro with back-up and maintenance power at non-discriminatory, just and reasonable rates. This Court lacks subject matter jurisdiction over these "as applied" claims. See 16 U.S.C. § 824a–3(g), section 210(g) of PURPA. In general, section 210(h)(2)(B) of PURPA limits federal court jurisdiction to claims that nonregulated utilities such as Oglethorpe and the EMCs have failed to comply with their obligation under § 210(f)(2) of PURPA to devise an implementation plan, after notice and opportunity for public hearing, that is consistent on its face with FERC's regulations. Any subsequent claim that a nonregulated utility has failed to adhere to its own implementation plan in its dealings with a particular qualifying facility must be bought in state court, which has exclusive jurisdiction "to enforce any requirement" of a nonregulated utility's implementation plan. 16 U.S.C. § 824a–3(g)(2) (incorporating 16 U.S.C. § 2633 by reference). That this is the FERC's interpretation of PURPA's en-

forcement mechanism is clear. *See Snow Mountain Pine Co. v. CP National Corp.,* FERC Docket No. EL84–25–000, issued March 19, 1985 ("As the commission has previously noted, complaints regarding an alleged refusal to purchase power from a qualifying facility and the rates for such purchases are matters properly brought in a State forum."); *Roche Products, Inc., et al.,* 29 FERC ¶ 61–098 (1984) ("matters of application of [a utility's] rules ... are properly brought before state judicial forums"). *See also* Policy Statement Regarding the Commission's Enforcement Role Under Section 210 of the Public Utility Regulatory Policies Act of 1978, 48 Fed. Reg. ¶ 29475, 29476, 23 FERC ¶ 61,304, 61,-645 (1983).

As the Eleventh Circuit said regarding the FERC's interpretations of its own regulations, "[t]his court has adopted the basic rule of administrative law that '[a]n agency's interpretation of its own regulations is entitled to great deference.' *South Georgia Natural Gas Co. v. Federal Energy Regulatory Commission,* 699 F.2d 1088, 1090 (11th Cir.1983); *Pennzoil Co. v. Federal Energy Regulatory Commission,* 645 F.2d 360, 383 (5th Cir.1981), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 [additional citations omitted]. Accordingly '[t]he agency's view must be upheld unless it is so plainly erroneous or so inconsistent with either the regulation or the statute authorizing the regulation that its decision is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.' 699 F.2d at 1090. [additional citations omitted]. 'As long as the agency's interpretation is reasonable, a reviewing court cannot overrule it even though other interpretations might strike the court as more reasonable.' 699 F.2d at 1090. [additional citations omitted]." *Florida Gas Transmission Co. v. Federal Energy Regulatory Commission,* 741 F.2d 1307, 1309–10 (11th Cir.1984).

▮▮ Greensboro argues that this Court has jurisdiction over its PURPA claims under 16 U.S.C. § 824a–3(h)(2)(B). This section, however, applies only when the FERC

does not act within 60 days from the date on which a petition is filed to enforce the requirements of 16 U.S.C. § 824a–3(f). In this case, there are no allegations that any of the defendants failed to meet the requirements established in that subsection. This Court further notes that any allegations made under state law that Rayle EMC failed to provide adequate retail service at a just and reasonable rate properly lie in either state court or with the PSC. *See* O.C.G.A. § 46–3–8(c)(1).

■ The only claim left against the Oglethorpe Group which remains to be considered by this Court is Count VI, Greensboro's state law breach of contract claim. In light of the fact that this Court, in this order, has granted summary judgment to Oglethorpe and the EMCs on all of the federal claims asserted against them, this Court feels that it would be inappropriate to exercise pendent jurisdiction over Greensboro's state law claim. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

**40.** In order to accomplish these goals, MEAG was granted certain powers pursuant to O.C.G.A. § 46–3–126 which include, inter alia, the power:

(5) To acquire, by purchase or otherwise, in whole or in part, as provided in paragraph (3) of this Code section, and to place into operation and operate or cause to be placed into operation and operated, either as owner of all or of any part in common with others or as agent, electric generation and transmission lines, works, facilities, and projects; to provide, by sale or otherwise, an adequate, dependable, and economical electric power supply to political subdivisions of this state contracting with the authority pursuant to authority of Code Section 46–3–130; and, through such political subdivisions, to supply such electric power to the members of the public in the areas served by them; and, as agent for such political subdivisions, to secure power supply contracts and arrangements with other persons. The authority shall also have the power, which may be exercised either as principal or as agent, to manufacture, generate, store, and transmit electric current

## MEAG and the Participants

MEAG and the Participants (hereinafter "the MEAG Group") argue that their actions are immune from antitrust scrutiny pursuant to the state action immunity doctrine first expressed in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). This Court agrees.

The statutory purpose of MEAG, as set out in O.C.G.A. § 46–3–125, is,

to acquire or construct, or to acquire and construct, and to operate and maintain, or to cause to be constructed, operated, and maintained, electric generation and transmission facilities. In addition, it shall be the purpose of the authority to take all other necessary or desirable action in order to provide or make available an adequate, dependable, and economical supply of electric power and energy and related services to those political subdivisions [which, on March 18, 1975, owned and operated an electric distribution system, § 46–3–130] which may desire the same and, incidentally and so as to take advantage of economies of scale in the generation and transmission of electric power and energy, to other persons and entities.[40]

for light, heat, power, and energy; to manufacture, buy, sell, import, export, lease or otherwise acquire and generally deal in electrical apparatuses of all kinds and machinery and devices and nuclear or fossil fuels for the manufacture, generation, storage, and transmission of electric current for light, heat, power, and energy, to purchase power at retail or wholesale from any other person; to purchase or construct part of the capacity of generation or transmission projects sponsored and owned by or in common with others, making any such purchase at wholesale or retail within or without this state; to contract for the purchase of power and energy from, or the sale of power and energy to, the United States government and electric utility systems either privately or publicly owned, within or without this state to execute long- or short-term power purchase or sale contracts on terms which may include agreements and respect to resale rates and the disposition of revenues; to interchange, exchange, and purchase power and energy from any person to erect, buy, lease, or otherwise acquire, operate, and maintain electric lighting, heating,

In order to finance its activities, MEAG is authorized to issue revenue bonds "to be payable from the revenues, receipts, and earnings of the projects of the authority and other available funds thereof." O.C. G.A. § 46-3-126(11). However, pursuant to section 46-3-131, the Superior Court of Fulton County must validate the issuance of all MEAG revenue bonds. MEAG currently has an outstanding debt in excess of $2,500,000.00. In order to obtain revenues, MEAG has the right to contract with each of the Participants pursuant to O.C.G.A. § 46-3-129(a) which provides as follows:

The authority may contract with any political subdivision of this state which is authorized by Code Section 46-3-130 to make such contracts for the payment of such rates, tolls, fees, and charges as may be prescribed by the authority for the use by such subdivisions or the residents thereof of the services and facilities of the projects and facilities of the authority. Any such political subdivision shall have the right and power, by resolution of its governing body, to make such a contract; and the amounts contracted to be paid by such political subdivision to the authority under such a contract shall constitute general obligations of such political subdivision for the payment of which the full faith and credit of such political subdivision may be pledged to provide the funds required to fulfill all obligations arising under any such contract.

Additionally, O.C.G.A. § 46-3-129(d) provides that, "[a]ny political subdivision which contracts with [MEAG] under this article may obligate itself and its successors to use only those projects for which it has contracted and none other." The revenue from these contracts is pledged as security for the bonds as authorized. O.C. G.A. § 46-3-135.

and power projects; to transmit power both for itself and on behalf of others; to erect, buy, sell, lease, or otherwise acquire, maintain, and operate or cause to be maintained and operated plants, underground subways, conduits, poles, and wires above, upon, and under the streets, alleys, lands, and territories of political subdivisions, public or private corporations, or individuals and to continue to sell electric power to political subdivisions of this state which are authorized to contract with the authority pursuant to Code Section 46-3-130 and to other persons and entities and, as agent for any or all of the same, to make power and energy otherwise available to them through arrangements with other persons, all in the exercise of the powers of the authority and to effectuate the purposes of this article;

\* \* \* \* \* \*

(7) To exercise any one or more of the powers, rights, and privileges conferred by this Code section either alone or jointly or in common with one or more other parties or utilities, whether public or private. In any such exercise of such powers, rights, and privileges jointly or in common with others with respect to the construction, operation, and maintenance of electric generation or transmission facilities, the authority may own an undivided interest in such facilities with any other parties, whether public or private. The authority may enter into agreements with respect to any such electric generation or transmission facility with the other parties participating therein, and any such agreement may contain such terms, conditions, and provisions consistent with this article as the parties thereto shall deem to be in their best interests. Any such agreement may include, but need not be limited to, provisions for the construction, operation, and maintenance of such electric generation or transmission facility by any one or more of the parties to such agreement, which party or parties shall be designated in or pursuant to such agreement as agent or agents on behalf of itself and one or more of the other parties thereto, or by such other means as may be determined by the parties thereto. Such an agreement may also include provisions for methods of determining and allocating among or between the parties the costs of construction, operation, maintenance, renewals, replacements, improvements, and disposals with respect to such facility. In carrying out its functions and activities as such agent with respect to the construction, operation, and maintenance of such a facility, such agent shall be governed by the laws and regulations applicable to such agent as a separate legal entity and not by any laws or regulations which may be applicable to any of the other participating parties. Notwithstanding any other law to the contrary, pursuant to the terms of any such agreement the authority may delegate its powers and duties with respect to the construction, operation, and maintenance of such facility to the party acting as agent; and all actions taken by such agent in accordance with the provisions of such agreement may be made binding upon the authority without further action or approval by the authority;

Accordingly, MEAG and 47 political subdivisions, its Participants, entered into a series of four substantially identical wholesale power sales contracts in which each Participant agreed to take from MEAG its "bulk power supply", pursuant to rates and charges established by MEAG, except that each Participant may seek alternate sources as provided by the contracts. "Bulk power supply" is defined as electric power and energy needed by a Participant in excess of that amount (1) supplied by any generation and transmission resources owned by such Participant on the effective date of the contract (this only applies to Crisp County which owns its own generating facilities), (2) received by such Participant from SEPA, and (3) procured by such Participant from alternate bulk power supply sources permitted under the contract. The bulk power supply covered in these wholesale power sales contracts consists of "project power" and "supplemental power." Project power is furnished by output and services from MEAG's ownership of generation and transmission facilities. Supplemental Power, the amount of power required in excess of project power, is supplied by MEAG through wholesale purchases, or other purchases and exchanges, from other electric utilities. Most of MEAG's supplemental power requirements are currently met by purchases from Georgia Power in accordance with Georgia Power's partial requirements tariff on file with, and approved by, the FERC.[41] However, the wholesale power sales contracts provide that the Participant may purchase supplemental power from sources other than MEAG subject to notice requirements varying from two to nine years depending upon the amount of power involved. The notice provisions purport to reflect the need for long-term forecasting and planning for power supply. Each contract has a provision for shortening the notice periods if cancellation of power by a Participant would not impose a burden or cost on MEAG.

The MEAG Group contends that these firm requirement contracts for bulk power supply are needed in order that MEAG may sell revenue bonds to finance its participation in the generation and other projects authorized by statute. These four wholesale power sales contracts were all approved by the Superior Court of Fulton County. Additionally, the Georgia Supreme Court affirmed the judgment of the Superior Court of Fulton County vis-a-vis the first wholesale power sales contract. The Georgia Supreme Court specifically held that the Participants are authorized not only by O.C.G.A. §§ 46–3–110 *et seq.* but also by the Constitution of the State of Georgia to enter into the wholesale power sales contracts with MEAG, to pledge their full faith and credit, and to levy taxes in order to meet their payment obligations under such contracts. *Thompson v. Municipal Electric Authority of Georgia,* 238 Ga. 19, 231 S.E.2d 720 (1976).

On March 27, 1985, the Supreme Court decided two cases which strengthen and give new breadth to the state action antitrust immunity doctrine for municipalities and other state and local political entities, as well as to private persons acting pursuant to state law. In light of these decisions, this Court agrees with the MEAG Group's argument that it is entitled to antitrust immunity.

In *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), a unanimous Court held that a municipality alleged to have engaged in anticompetitive activities was protected by the state action exemption to the federal antitrust laws. The petitioners were four Wisconsin unincorporated townships located adjacent to the City of Eau Claire. The petitioners alleged that the city had violated the Sherman Act by acquiring a monopoly over the provision of sewage treatment services in Eau Claire County, where three of the townships were located, and in Chippewa County, where the remaining township was located, and by tying the provision of such services to the provision of

---

**41.** *See* P. 1352, *supra.*

sewage collection and transportation services. The city had obtained federal funds to build a sewage treatment facility, the only one available to the townships, within the Eau Claire Service Area. The city refused to supply sewage treatment service to individual landowners in the areas of the petitioner-townships because a majority of the individuals in those areas had not voted by referendum election to have their homes annexed by the City of Eau Claire and to use its sewage collection and transportation services. The statute in question authorized the city to provide sewage services and also to determine the areas to be served. This statute was supplemented by another statute of general application that allowed any city operating a public utility to fix the limits of service and provided that the municipal utility would have no obligation to serve beyond such area.

Alleging that they were potential competitors in the collection and transportation of sewage, the townships argued that the City of Eau Claire used its monopoly over sewage treatment to gain an unlawful monopoly over the provision of sewage collection and transportation services. The townships also contended that the city's actions constituted an illegal tying arrangement and an unlawful refusal to deal with the townships.

It is well-established that the anticompetitive conduct of a State acting through its legislature is beyond the reach of the antitrust laws. *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). However, municipalities are not beyond the reach of the antitrust laws solely by virtue of their status because they are not themselves sovereign. *City of LaFayette v. Louisiana Power & Light Co.*, 435

U.S. 389, 412, 98 S.Ct. 1123, 1136, 55 L.Ed.2d 364 (1978). "[B]efore a municipality will be entitled to the protection of the state action exemption from the antitrust laws, it must demonstrate that it is engaging in the challenged activity pursuant to a clearly expressed state policy." *Town of Hallie*, 105 S.Ct. at 1717. The Court also stated that,

> [t]he determination that a municipality's activities constitute state action is not a purely formalistic inquiry; the State may not validate a municipality's anticompetitive conduct simply by declaring it to be lawful. [*Parker*, 317 U.S. at 351, 63 S.Ct. at 313–14]. On the other hand, in proving that a state policy to displace competition exists, the municipality need not "be able to point to a specific, detailed legislative authorization" in order to assert a successful *Parker* defense to an antitrust suit. [*City of LaFayette*, 435 U.S. at 415, 98 S.Ct. at 1138].

*Town of Hallie*, 105 S.Ct. at 1716–17.

In answering the question "how clearly a state policy must be articulated for a municipality to be able to establish that its anticompetitive activity constitutes state action," *id.* at 1717, the Court held that if the statutes in question "clearly contemplate that a city may engage in anticompetitive conduct" such that the anticompetitive conduct is a "foreseeable result" of the statutory authorization, it is sufficient. *Id.* at 1718. Moreover, where a state has "delegated to the cities the express authority to take action that foreseeably will result in anticompetitive effects," the basis for immunity has been established.[42]

Additionally, the Court held that it is unnecessary for the State to provide "ac-

---

**42.** The townships had argued that in order to pass the "clear articulation" test, a legislature must expressly state in a statute or its legislative history that it intends for the delegated action to have anticompetitive effects. In rejecting this argument, the Court stated that, "[t]his contention embodies an unrealistic view of how legislatures work and of how statutes are written. No legislature can be expected to catalog all of the anticipated effects of a statute of this kind." *Town of Hallie*, 105 S.Ct. at 1719. The Court

also rejected an argument by the townships that the "clear articulation" requirement mandates that the State compel the municipality to act in an anticompetitive manner. The Court held that the activities of a municipality, an arm of the State, need not be compelled by, but need merely be permitted or authorized by, statute because it may be presumed, "absent a showing to the contrary, that the municipality acts in the public interest." *Id.* at 1720.

tive supervision" of a municipality as to the matters involved. The Court noted that, "the requirement of active state supervision serves essentially an evidentiary function: it is one way of ensuring that the actor is engaging in the challenged conduct pursuant to state policy." *Id.* at 1720. Where the actor is a municipality, "[t]he only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy."

The breadth of implied immunity that the Supreme Court held to be appropriate in interpreting state statutes in *Hallie* was given even greater breadth in *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). The case involved the actions of private parties, motor common carriers, in four states. In those states, the respective Public Service Commissions set the rates for the carriers for the intrastate transportation of general commodities. The common carriers were required by statute to submit proposed rates to the relevant commission for approval. If the state agency took no action within a specified time period, the proposed rate became effective. If a hearing was scheduled, the rate would become effective only after affirmative agency approval.

In all four states, the common carriers were permitted by statute to agree on rate proposals prior to their joint submission to the regulatory agency. Collective rate making, however, was not compelled by any of the states; every common carrier remained free to submit its own rate proposal to the agency.

The defendants in the case were two private associations composed of motor carriers operating in the four states. Both organizations had committees that considered possible rate changes and, if they felt it appropriate, submitted collective proposals to the Public Service Commission in each state. Disapproving members, however, were not bound by the joint proposal.

The United States charged that the two rate bureaus had conspired with their members to fix rates for the intrastate transportation of general commodities in violation of the federal antitrust laws. In holding for the carriers, the Court decided that it was not necessary that the activity in question be "compelled" by state law, so long as the state evidences its intent to permit the activity.[43] The Court reasoned that just because a State does not compel anticompetitive behavior does not mean it has no interest in whether or not its permissive policies work:

> Most common carriers probably will engage in collective rate making, as that will allow them to share the cost of preparing rate proposals. If the joint rates are viewed as too high, however, carriers individually may submit lower proposal rates to the commission in order to obtain a larger share of the market. Thus, through the self-interested actions of private common carriers, the States may achieve the desired balance between the efficiency of collective rate making and the competition fostered by individual submissions.

*Id.,* 105 S.Ct. at 1728. Indeed, "insofar as it encourages states to require, rather than merely permit, anticompetitive conduct, a compulsion requirement may result in *greater* restraints on trade." *Id.* at 1729. The Court went on to find the anticompetitive conduct in question was taken pursuant to a "clearly articulated state policy." Interestingly, the legislature of one of the states had not expressly approved collective rate making; nevertheless, the Court

---

**43.** In so doing, the Court did "not suggest, however, that compulsion is irrelevant. To the contrary, compulsion often is the best evidence that the State has a clearly articulated and affirmatively expressed policy to displace competition. [citations omitted]. Nevertheless, when other evidence conclusively shows that a State intends to adopt a permissive policy, the absence of compulsion should not prove fatal to a claim of *Parker* immunity." *Southern Motor Carriers,* 105 S.Ct. at 1729–30.

held that the state's legislature had "articulated clearly its intent [by granting the State Public Service Commission general authority to regulate common carriers] to displace price competition among common carriers with a regulatory structure." *Id.* at 1731.[44] Additionally, the Court stated that,

[i]f more detail than a clear intent to displace competition were required of the legislature, States would find it difficult to implement through regulatory agencies their anticompetitive policies. Agencies are created because they are able to deal with problems unforeseeable to, or outside the competence of, the legislature. Requiring express authorization for every action that an agency might find necessary to effectuate state policy would diminish, if not destroy, its usefulness.

*Id.* The fact that the agency had acted discretionarily when it decided to encourage joint price-setting among private actors was deemed adequate to effect immunity. *Id.* at 1730.

■■■ In the case at bar, it is undisputed that MEAG itself is an "instrumentality of the state", O.C.G.A. § 46-3-112. The Georgia legislature specifically, "found, determined and declared that the creation of the authority and the carrying out of its corporate purposes are in all respects for the benefit of the people of this state and that the authority is an institution of purely public charity performing an essential governmental function." O.C.G.A. § 46-3-128. MEAG is doubly vested in implementing what is in the public interest: it is a state instrumentality with defined purposes and accreditation, and it acts on behalf of the Participants, which are themselves political entities within the state. Indeed, the statute treats MEAG as being on an even

plane with the Georgia Public Service Commission; it expressly removes MEAG's actions from Commission review. O.C.G.A. § 46-3-152. Under the new, broader standard of the state action exemption articulated in *Town of Hallie* and *Southern Motor Carriers,* both the power supply arrangements between MEAG and the Participants and MEAG's participation in the ITS and its joint ownership agreements are clearly exempt from federal antitrust laws. The State of Georgia formed MEAG for the purpose of supplying wholesale bulk electric power to a group of state subdivisions. It would be illogical to hold MEAG, by doing that for which it was organized, or the Participants, for participating in MEAG, subject to antitrust liability.

As to the wholesale power sales contracts, MEAG was specifically created for the purpose of taking all "necessary or desirable action in order to provide or make available an adequate, dependable, and economical supply of electric power and energy and related services" to political subdivisions in the State of Georgia. O.C.G.A. § 46-3-125. This is because "it is declared that there exists in this state a need for an authority to function without profit in developing and promoting for the public good in this state adequate, dependable, and economical sources and supplies of bulk electric power and energy...." O.C.G.A. § 46-3-110. Accordingly, MEAG is authorized, as "agent for such political subdivisions, to secure power supply contracts and arrangements with other persons ...; to purchase power at retail or wholesale from any other person; ... to execute long-or short-term power purchase or sale contracts ...; [and to act] as agent for any or all of the same to make power and energy otherwise available to them through ar-

---

**44.** In *Town of Hallie,* the Court confirmed the two-pronged test first enunciated in *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) for cases in which state action exemption was claimed by a private party. *Town of Hallie,* 105 S.Ct. at 1720. In *Southern Motor Carriers,* the Court held that the petitioners satisfied the first prong of the *Midcal* test, that anticompeti- tive conduct be taken pursuant to a clearly articulated state policy. The second prong, active state supervision, was not an issue before the Court because the government had stipulated that the relevant States, through their agencies, actively supervised the conduct of the private parties. *Southern Motor Carriers,* 105 S.Ct. at 1731.

rangements with other persons, all within the exercise of the powers of the Authority and to effectuate the purpose of this article." O.C.G.A. § 46–3–126(5). As in *Southern Motor Carriers*, none of the political subdivisions is obligated to become a Participant in MEAG or otherwise to contract with MEAG. However, with respect to those that do, MEAG is authorized to represent them as agent or to deal with them as principal and to sell electric power to them. *Id.*

The Court finds that it was not merely "foreseeable", rather it was anticipated that at least some, if not most, of the State's municipalities would become Participants of MEAG and that the Participants would enter into binding long-term commitments with MEAG. These contractual provisions are inherent in MEAG's statutory mission and are barred from antitrust scrutiny under *Town of Hallie*.[45]

As to participation in the ITS and the joint ownership of generation facilities, MEAG is empowered "to acquire and construct, and to operate and maintain, or to cause to be constructed, operated, and maintained electric generation and transmission facilities." O.C.G.A. § 46–3–125. Collective participation in joint generation

and transmission facilities is expressly authorized by O.C.G.A. § 6–3–126(5), wherein MEAG is empowered "[t]o acquire, by purchase or otherwise, in whole or in part, ... and to place in operation and operate ... either as owner of all or of any part in common with others or as agent, electric generation and transmission lines...." Further, O.C.G.A. § 46–3–126(7) empowers MEAG to engage in these activities "either alone or jointly or in common with one or more other parties or utilities, whether public or private." O.C.G.A. § 46–3–126(7) goes on to provide:

> In any such exercise of such powers, rights and privileges jointly or in common with others with respect to the construction, operation, and maintenance of electric generation or transmission facilities, the authority may own an undivided interest in such facilities with any other parties, whether public or private. The authority may enter into agreements with respect to any such electric generation and transmission facility with the other parties participating therein, and any such agreement may contain terms, conditions, and provisions consistent with this article as the parties thereto shall deem to be in their best interests.

---

45. This Court notes that to the degree that the MEAG Group's power supply contracts permit the Participants to buy supplemental power from Greensboro, Greensboro cannot claim that it has suffered any harm. Indeed, there is no claim that MEAG or any of the Participants refused to buy power from (or sell power to) Greensboro on the basis of the power supply contracts.

The plaintiff would have this Court determine whether the contractual notice provisions, which vary from two to nine years depending upon the amount of power involved, with respect to the supplemental power provisions by which a Participant can buy power from other services, are "reasonable" in view of MEAG's mandate to plan for and secure the power needs of its Participants. In light of *Town of Hallie* and *Southern Motor Carriers*, this is not a proper subject of inquiry for a federal court. Once the state has committed an area, in this case power supply contracting for Georgia political subdivisions, to the discretion of a state-empowered authority, a court should not undertake to review specific contractual terms. To require a state to legislate details such as the length of

power supply obligations or notice provisions with greater specificity, would so stagnate and constrict the process that it would impose "detrimental side effects" upon the authority's ability to carry out its statutory mission. *Town of Hallie*, 105 S.Ct., at 1719. *See also Southern Motor Carriers*, 105 S.Ct. at 1731 ("Requiring express authorization for every action that an agency might find necessary to effectuate state policy would diminish, if not destroy, its usefulness.").

Greensboro also argues that, even if MEAG has been granted sufficient authorization to enter into power supply contracts for the sale of bulk power, MEAG has extended beyond such authorization by entering into power supply contracts for the sale of supplemental bulk power. This Court rejects this argument. MEAG is empowered to make power and energy available to the Participants "through arrangements with other persons...." O.C.G.A. § 46–3–126(5). Therefore, this Court feels that supplemental bulk power falls within the scope of the Georgia statute providing that the Participants can obligate themselves to use exclusively the "projects" of MEAG. O.C.G.A. § 46–3–129(d).

The section goes on specifically to authorize provisions for the construction, operation and maintenance of transmission facilities; for the designation of one party to act as agent for one or more parties to the agreement; and for the determination of methods of allocating among the parties the costs of construction, operation, maintenance, and the delegation of certain powers. *Id.* Any anticompetitive effects which MEAG's participation in the ITS and joint ownership agreements might cause [46] were a foreseeable result of the specific authorizations contained in Georgia law. Accordingly, MEAG's participation in the ITS and joint ownership agreements is immune under *Town of Hallie* and *Southern Motor Carriers* from antitrust attack.

Greensboro argues that the MEAG Group's reliance on *Town of Hallie* and *Southern Motor Carriers* is misplaced. Greensboro maintains (1) that the statutes pursuant to which the MEAG Group has acted do not reflect a clearly articulated state policy to replace competition with regulation or monopoly public service and (2) that, even if MEAG could demonstrate that its activities are pursuant to a clearly articulated state policy, MEAG is not cloaked with federal antitrust immunity under the state action doctrine because any such state policy is not actively supervised by the State of Georgia. This Court finds both of these arguments to be without merit.

Greensboro suggests that the statutes pursuant to which the MEAG Group has acted do not reflect a clearly articulated state policy because the statutory scheme is permissive in nature and because the state's position in these matters is one of mere neutrality. As previously discussed, *Town of Hallie* and *Southern Motor Carriers* make clear that even though a statutory scheme is permissive, it may still represent a clearly articulated state policy. Greensboro, however, attempts to liken the Georgia statutes implicated in this case to the Home Rule Amendment involved in *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). In the *City of Boulder* case, a municipality contended that its status as a "home rule" municipality under the Colorado Constitution entitled it to state action antitrust immunity, and that it was thereby entitled to restrict in an anticompetitive way the business of its cable television franchisee. The Home Rule Statute was a very general law which purported to extend to municipalities every power possessed by the state legislature; the Amendment did not in any way address the regulation of cable television. The Supreme Court rejected the City of Boulder's contention of state action immunity, finding that "the requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive." *Id.* at 56, 102 S.Ct. at 843.

Greensboro's analogy to the Home Rule Amendment involved in *City of Boulder* is inapposite. In this case, Georgia has, with a great deal of specificity, authorized the MEAG Group to enter into the very types of arrangements which Greensboro challenges. "No reasonable argument can be made that these statutes are neutral in the same way that Colorado's Home Rule Amendment was." *Town of Hallie*, 105 S.Ct. at 1719.

■ Greensboro maintains that, in order for the MEAG Group to enjoy state action immunity, there must be active state supervision of the clearly articulated state policy. It is clear that MEAG is an "instrumentality of the state". O.C.G.A. § 46–3–122. In *Town of Hallie*, the Supreme Court decided that the active state supervision requirement did not apply to a municipality. Greensboro argues that this holding should not be extended to cover instrumentalities of the state such as MEAG.

---

**46.** As this Court has already noted, any alleged harm which Greensboro has suffered as a result of the ITS and the joint ownership agreements is, at best, speculative; and, therefore, Greensboro lacks standing to challenge the joint ownership and joint transmission agreements among the defendants. *See* p. 1369–71, *supra*.

This Court, however, disagrees. Although the issue is still open, the Supreme Court has stated that, "[i]n cases in which the actor is a state agency, it is likely that active state supervision would also not be required...." *Town of Hallie*, 105 S.Ct. at 1720 n. 10. It seems illogical to this Court to cloak a single municipality with state action immunity without requiring active state supervision but not to do the same for MEAG which represents an association of many municipalities in the State of Georgia acting pursuant to clearly articulated state policy toward a broad common interest.[47]

Greensboro has also challenged the MEAG Group's PURPA Implementation Policy.[48] The plaintiff argues that the buy/sell divisions between MEAG and the Participants as set forth in their Interconnection Policy violates PURPA on its face. Greensboro also alleges that the MEAG Group declined to pay for Greensboro's capacity and refused to deal fairly with it on energy purchases, even though their Interconnection Policy provides for both kinds of purchases at avoided cost. Hence, the plaintiff claims that the MEAG Group's application of its Interconnection Policy violates PURPA.

 As to the provision of the MEAG Group's Interconnection Policy regarding sales, this Court notes that MEAG is a creature of Georgia Statute and is without

authority to sell at retail to anyone. As well, both MEAG and the Participants are, in any event, barred by the Georgia Territorial Electric Service Act from selling retail service to Greensboro.

The Georgia Territorial Electric Service Act exempts all of the defendants except Rayle EMC from any obligations it might otherwise have under PURPA to sell power at retail to Greensboro. Under this Act, the PSC has assigned to individual electric power suppliers exclusive rights to sell power within that assigned territory. The Act clearly prohibits electric utilities from serving customers in a territory assigned to another utility without that utility's consent. This prohibition is subject to only certain limited exceptions which are not applicable here. It is undisputed that Greensboro lies within the territory that has been assigned to Rayle EMC. MEAG presently does not serve or seek to serve any retail loads and is not subject to PSC regulation. While, theoretically, it would be possible for MEAG or the Participants to provide retail services to Greensboro under the Act, if Rayle EMC were to give its consent and if the PSC were to approve of it, O.C.G.A. § 46-3-8(c)(1, 2), the fact remains Rayle EMC has not consented to let MEAG, the Participants, or anyone else for that matter, sell at retail to Greensboro; nor, under the Act, it is required to do so.

---

**47.** MEAG also moves for summary judgment as to Counts I, II, and III on the basis of lack of standing, the statute of limitations established in § 4B of the Clayton Act, 15 U.S.C. § 15b, and the doctrine of laches. Except for the view already expressed by the Court that the MEAG Group's participation in the ITS causes no antitrust harm to Greensboro, this Court expresses no opinion at this time on these contentions.

**48.** MEAG was designated by fourty-five of the Participants as their agent for entering into power supply arrangements with cogenerators and small power production facilities in order to meet their obligations under Section 210 of PURPA. MEAG's PURPA Policy Statement sets forth MEAG's purchase policy in part as follows:

1. The participating cites will buy either full output or excess energy (at the QF's [Qualified Facility] option) from QF's with a design capacity of 100 kW or less. The rate paid will be based on an estimated average avoided

energy cost, which will be provided to each participating city by MEAG staff.

2. MEAG will buy either full output or excess energy (at the QF's option) from QF's with a design capacity greater than 100 kW. The rate paid will include monthly average avoided costs, based upon a formula, which accounts for actual Partial Requirement (PR) energy cost adjustments as billed to MEAG from [Georgia Power].

MEAG's sales policy is as follows:

1. Participating cities will sell supplemental, backup, maintenance, and interruptible power to QF's with a design capacity of 100 kW or less, at a rate (or rates) prepared by the individual cities.

2. Participating cities will sell supplemental, backup, interruptible, and maintenance power, to QF's with a design capacity above 100 kW, at a rate (or rates) prepared by the cities.

Thus, even if MEAG were required by the FERC or this Court to revise its Interconnection Policy to authorize sales by it to unassigned qualifying facilities, state law, specifically O.C.G.A. § 46–3–11(b)(4), would still preclude MEAG from selling to Greensboro. For this reason, Greensboro lacks standing before this Court to challenge the sales provisions of the MEAG Group's Interconnection Policy. *See Steele v. National Firearms Act Branch,* 755 F.2d 1410, 1414 (11th Cir.1985) (Article III standing requires that a plaintiff show that his alleged injury is "likely to be redressed by the requested relief ..."). *See also Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 72, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976).

■ Greensboro's argument that PURPA pre-empts all state territorial service laws, including Georgia's is unpersuasive. While federal regulation may, in some circumstances, pre-empt state law, that can only occur where the following conditions have been met:

The [agency] must have (1) resolved to preempt the specific area in question; the determination must (2) represent a reasonable accommodation of conflicting policies; and (3) the agency must have authority to preempt.

*Cox Cable New Orleans, Inc. v. City of New Orleans,* 594 F.Supp. 1452, 1461 (E.D. La.1984) (quoting *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 2701, 81 L.Ed.2d 580 (1984)). Pre-emption may only be established "by the regulatory agency's clear expression of an intent to preempt state law." *Cox Cable,* 594 F.Supp. at 1461.

Nothing can be found in the FERC's PURPA regulations which demonstrates a "clear expression" to pre-empt state territorial service laws. To the contrary, the regulations' Preamble recognizes that, " ... State law ordinarily sets out the obligation of an electric utility to provide service to customers located within its ser-

vice area. In most instances, therefore, this rule will not impose additional obligations on electric utilities." FERC Order No. 69, 45 Fed.Reg. ¶ 12214, 12220 (1980). The Preamble further acknowledges that, "an electric utility is only required to construct lines or other facilities to the extent authorized or required by State or local law. As a result, a qualifying facility outside the service area of a utility may be required to build its line into the service area of the utility." *Id.* Additionally, while Congress authorized the FERC in section 210(e) of PURPA to exempt qualifying facilities from state laws and regulations, it limited this authority specifically to laws "respecting the rates, or respecting the financial or organizational regulation, of electric utilities...." 16 U.S.C. § 824a–3(e). Congress did not authorize the FERC to grant exemptions to qualifying facilities from other state laws or regulations, such as territorial service laws. *See also Federal Energy Regulatory Commission v. Mississippi,* 456 U.S. 742, 759, 765 n. 29, 102 S.Ct. 2126, 2137, 2140 n. 29, 72 L.Ed.2d 532 (1982) ("In PURPA, ..., the Federal Government attempts to use state regulatory machinery to advance federal goals." "It eems evident that Congress intended to defer to state prerogatives—and expertise—in declining to pre-empt the utilities field entirely."); *Consolidated Edison Co. of New York, Inc. v. Public Service Commission,* —— U.S. ——, 105 S.Ct. 1831, 85 L.Ed.2d 132 (1985) (Supreme Court dismisses a PURPA preemption claim as not presenting a substantial federal question.). Moreover, in enacting section 210 of PURPA, Congress intended that each qualifying facility have "an opportunity to deal with *a* utility" in obtaining supplemental and back-up power at nondiscriminatory, just and reasonable rates. 32 FERC ¶ 61,-103, 61,284 (emphasis added). The Georgia Territorial Electric Service Act is fully consistent with this objective since it permits Greensboro to obtain power at nondiscriminatory, just and reasonable rates from Rayle EMC.

The FERC's decision in the *Oglethorpe* case *a fortiori* validates the MEAG Group's Interconnection Policy regarding purchases. In that case, the FERC validated the Oglethorpe Group's Interconnection Policy as not being inconsistent with PURPA's goal of encouraging qualifying facilities even though it stated that Oglethorpe would make all purchases of energy and capacity for the EMCs. With respect to the MEAG Group's PURPA policy, MEAG is to make purchases on behalf of the Participants from qualifying facilities with a design capacity above 100 kW; however, the Participants are permitted to make purchases from facilities below that size. Because Oglethorpe's authority to make power purchases at all levels for the EMCs was affirmed by the FERC, it follows *a fortiori* that MEAG's more-limited authority to make power purchases only at higher capacity levels is consistent with PURPA.

The Court notes further that, as with the Oglethorpe Group, MEAG claims that it purchases power from qualifying facilities at fully avoided cost, the amount mandated by PURPA; the Participants, in turn, purchase this power from MEAG which sells it to them on a nonprofit basis. It seems incongruous to argue that the Participants would be willing to pay more to qualifying facilities such as Greensboro for the same power it could purchase from MEAG or Georgia Power for less. For the reasons stated earlier in this opinion, this Court believes that any "as applied" PURPA claims that the plaintiff has brought against the MEAG Group, such as its claim that MEAG has wrongfully refused to pay anything for Greensboro's capacity and has refused to pay a fair price for its energy, properly belong in the state court system.

The MEAG Group has also filed a motion pursuant to F.R.Civ.P. 11 against Greensboro. It appears to the Court that the facts surrounding the negotiations which took place between the plaintiff and the MEAG Group prior to the time this suit was filed are in dispute. Suffice it to say that, although the Court has resolved the legal questions in the MEAG Group's favor, this Court cannot find that the plaintiff's complaint was filed in bad faith.

*City of Dalton and Georgia Power Company*

The plaintiff asserts antitrust claims against Dalton and Georgia Power related to their participation in the ITS. Because this Court has held, for reasons stated earlier in this opinion, that no antitrust harm results from participation in the ITS, the Court finds these claims to be without merit. The plaintiff also asserts a claim against Georgia Power challenging its alleged refusal to buy Greensboro's electricity output. The plaintiff concedes, however, that viable alternative purchases for this output exist. Indeed the plaintiff currently sells its output to Oglethorpe at a rate that is, in all probability, above market rate.[49] Under such circumstances, Georgia Power's unilateral refusal to deal does not constitute a violation of the federal antitrust laws. *See United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed.2d 992 (1919). *But cf. Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc.,* 365 F.2d 478 (5th Cir.1966) (monopolist who manipulates refusals to deal in order to preserve and extend its monopoly violated the Sherman Act).

In sum, the motions for summary judgment filed by all of the defendants in this action are hereby GRANTED. The motion for sanctions filed by MEAG and the Participants is hereby DENIED.

**49.** *See* n. 28, *supra.*